* Corpus Juris-Cyc. References; Abbreviations, 1CJ, p. 279, n. 14; Appeal and Error, 4 CJ, p. 668, n. 55, New; p. 745, n. 71; p. 764, n. 80; Master and Servant, 39CJ, p. 451, n. 59; p. 692, n. 6; p. 894, n. 48; p. 964, n. 89; p. 1132, n. 35; p. 1157, n. 18; p. 1167, n. 72; p. 1179, n. 75; p. 1194, n. 35; Negligence, 29 Cyc., p. 631, n. 53; p. 640, n. 13; Pleading, 31 Cyc., p. 96, n. 50; p. 468, n. 54; Trial, 38 Cyc., p. 1543, n. 69.
Plaintiff, a machinist's helper in defendant's shops in Sedalia, was, on November 16, 1923, injured by a heavy piston-rod falling upon and crushing his foot. He brought this suit for damages and recovered judgment in the sum of $1000, from which defendant has appealed.
The original petition designated the defendant as the "Missouri Pacific Ry. Co.," and, following the name thus given, the clerk issued summons directed to the Sheriff of Pettis county, in which Sedalia is located, commanding him to summon the "Missouri Pacific Railway Company" and the same was duly served on the defendant herein, the Missouri Pacific Railroad Company, and a return showing service on said last-named company was made. An answer and plea in abatement was filed on behalf and in the name of the Missouri Pacific Railway Company, setting up that it was not operating a line of railroad, nor did it own any shops in Pettis county on November 16, 1923, or since that time, and had no agent in said county on whom process could be served; wherefore, the action was prayed to be abated and the court's jurisdiction was questioned.
Plaintiff immediately applied for permission to amend petition and summons by changing the name from Missouri Pacific Railway Company to the Missouri Pacific Railroad Company, the latter being the corporation sued and upon which the service was had. After a hearing on said application, permission to amend was granted and the amendment was made. (It seems that the Missouri Pacific Railway Company as owner of the railroad *Page 22 
and property in question went into the hands of a Receiver and at a receiver's sale in February, 1917, its property was sold to the Missouri Pacific Railroad Company, and it is the corporation which has ever since owned and is now owning and operating the road and shops in question.)
The order allowing the amendment was made over the objection of defendant's counsel, being the same counsel who had filed the plea in abatement for the Missouri Pacific Railway Company. And when the amendment was made, a plea to the jurisdiction as to defendant was filed on the ground that the court had no power to permit said amendment without service of process on defendant for that purpose. Conjoined with said plea was an answer consisting of a general denial coupled with a plea of contributory negligence in that plaintiff "negligently pushed said piston from the truck or horse in such a manner as to cause it to fall upon the plaintiff's foot" and also a plea of assumption of risk.
There is no merit in the point that reversible error inheres in the court's allowing the amendment of the name by which defendant was designated in the petition and summons. The defendant was the corporation plaintiff brought suit against, or was intending to sue, and service was had upon it, not only as appears from the sheriff's return but from the evidence under the application to amend. No service was had upon the Missouri Pacific Railway
Company, and no such cause of action as alleged in the petition could have accrued against it. Process having been actually and properly served upon the defendant, and it being the right party but sued merely by the wrong name, the amendment was proper. [31 Cyc. 468; Marsula v. Gentry, 232 S.W. 1046; Green v. Strother,201 Mo. App. 418, 421, 427; Parry v. Woodson, 33 Mo. 347. See, also, Bedell v. Richardson, etc., Lubricating Co., 226 S.W. 653.] The fact that in both petition and return of service a portion of the names were indicated by appropriate abbreviations makes no difference, since they do not differ essentially from words *Page 23 
but are, like them, merely signs of thought. [In re Lakemeyer,135 Cal. 28. See, also, 1 C.J. 278-9; National Bond, etc., Co. v. Hennepin Co., 91 Minn. 63; Ryan v. Baltimore, etc., R. Co.,60 Ill. App. 612; Ripley v. Case, 78 Mich. 126; Converse v. Wend,142 Ill. 132.]
The only point made as to the merits is that defendant's demurrer to the evidence should have been sustained.
The petition, after alleging plaintiff's employment as a machinist's helper in the shops, his engagement in said work on the date above mentioned, and the fact that he was ordered by his foreman to take a large piston-rod from one part of such shops to another to have it cut off with an acetylene torch, continued:
"When plaintiff had reached the place of work of the acetylene welder he ordered the rod to be leaned against a horse so that one end of the rod was on the floor of the shop and the side of the rod near the other end was leaned against such horse.
"The welder was an employee of defendant, in charge of the work of cutting off the extension, and he ordered the said rod placed in such position, that being the position he desired to have the rod placed in order to do the work of cutting off the extension. At the place where the welder worked there was a great many pieces of metal, scraps, debris, trash and other miscellaneous materials scattered about the floor. The rod was of such great weight that it could not be lifted. After the welder had cut the extension off of the rod with an acetylene torch, it was the duty of the plaintiff, under his orders, to remove the rod to another part of the shop, and the ordinary way to do this work was to push the rod to the floor, and then place it upon a conveyance to take it to another part of the shop. Plaintiff attempted to push the rod off of the horse so that it would fall to the floor in order that it might be conveyed to another part of the shop, but when he attempted to push the rod, the horse, upon which it leaned, fell, and the plaintiff attempted to back out of the way so that the rod would not strike him, *Page 24 
but because of debris, metal and miscellaneous materials on the floor of the shop back of him he could not move out of the way, and the rod struck him upon the foot, breaking his foot and the bones therein and lacerating, bruising and injuring his foot.
"The injuries received by plaintiff to his foot were directly caused by the negligence of defendant."
As heretofore stated, the answer pleaded contributory negligence and assumption of risk; and the sole question is whether, under any possible view of the petition and the evidence in plaintiff's behalf, a case of liability under the law was made?
Plaintiff's witnesses consisted of himself, another machinist's helper by the name of Richardson who worked with plaintiff in bringing the pistons to and taking them away from the "welder's station" where they were cut off by the welder with the blow-torch, and another employee by the name of Yancey Johnson.
Plaintiff had worked in the shops about a year and had worked with Richardson about six or eight months; but, according to the evidence in his behalf, he had never worked at taking piston-rods to the welder's station before.
It is conceded that plaintiff and Richardson were ordered to take some piston-rods from a part of the shops to the acetylene welder's station in order to have them cut off. The pistons were of steel, about nine feet long and weighed about 700 pounds each. The two men moved two pistons on low trucks to the place where the cutting was to be done. This place, or "welder's station" as it is called, was a space about fifteen feet square and on it were scattered iron scraps of various kinds. An aisle ran from one end of the shop to the other along the west side of this station. On the north side was "a pile of stuff containing equalizers and stuff like that," on the west side was a "key-way machine" about eight feet long and on the east side was a pile of junk, pieces of scrap iron, etc., the smaller stuff extending up to within two or two-and-a-half feet of the horse on which the *Page 25 
piston was put while being cut off and "small stuff scattered all around there." Plaintiff said he could not particularly describe the pieces of iron and scraps on the floor as he did not observe or notice them carefully though he says he knew they were on the floor. The stuff scattered on the floor was supposed to be cleaned up every day, but it had not been cleaned up the day before, and was there when the injury occurred about nine in the morning.
When the truck arrived at the station with the pistons, the welder would not cut them off as they lay on the truck but wanted them placed on something higher. Thereupon he placed a trestle or horse in a place selected by him on his station. This horse was made of inch-and-a-half or two-inch gas pipe, with four legs of the same material, each pair of legs welded to the top or back of the horse about four or six inches from the ends of the top. The top, being of gas pipe, was, of course, round. The welder directed plaintiff and Richardson to place the pistons on the horse, that is, by leting the west end of the pistons rest on the floor and the east end to rest on the horse and project over beyond it and there be cut off. When, in obedience to the welder's directions, the plaintiff and Richardson went to lift the pistons on the horse the foreman remarked that it "didn't look safe" to put the piston-rods on that. Whereupon the welder said, "Set the horse behind this collar." There was a half-inch rounding collar on each of the pistons toward or not far from the east end, and while the two men raised each of the pistons up, the welder set the horse back or west of this collar. The horse was thus placed north and south with the two pistons having their west ends lying on the floor and slanting up to and beyond the top of the horse, said top being behind the collar on each piston. The foreman, a witness for defendant, testified that they put the horse up against the collar, "so if there was any danger of it slipping, that collar would have a tendency not to let the horse slip ahead — that is the reason we put the collar next to the horse, because the weight being one *Page 26 
end on the floor and the rest of the rod raised up, it would naturally push the rod this way if there wasn't something to hold the horse from going that way."
In that position a portion of the east end of each piston was cut off by the welder using his blow-torch.
When the ends were cut off, the foreman ordered the piston-rods to be taken elsewhere to a machine. Thereupon plaintiff, standing on the east side of the horse and facing west, shoved one of the pistons off the end of the horse and rolled it upon the truck. Plaintiff says that he then shoved it off the horse because he didn't "see any other chance to take it off." It was too heavy to lift and Mr. Richardson who had done such work before told him that had been the usual way of getting it off. When the first piston was shoved off Richardson went away with it on his truck.
Thereupon plaintiff likewise shoved the remaining piston to get it off the horse but this time the horse fell to the east against plaintiff, the top slipping east from under the piston and the latter instantly fell to the floor, the extreme end of it falling upon plaintiff's toe and mashing the arch of his instep. Plaintiff endeavored to jump back east or withdraw his foot as the piston fell, but his foot caught on, and was held by, a piece of scrap or junk iron on the floor so that he did not get his foot out in time.
Plaintiff testified that the only thing he knew about getting the piston off was the way Richardson had told him, and he shoved it that way thinking that the men who had handled them before should know more about it than he.
On cross-examination, when asked: "Didn't you know, and don'tyou know now, that a safer way would have been to get around on the west side of the horse and roll it off?," he answered, "I suppose it would have been."
"Q. Don't you know now it would have been? A. Probably it would have, I don't know.
"Q. It would have been safer? A. I don't know." *Page 27 
He was then asked if it wouldn't have been safer to have taken hold of one end of the horse and raised it up and dumped the piston off that way, and he replied that he didn't know, because "the horse would have reared up" and "there was a machine on that side." The foreman, witness for defendant, admitted that at first he thought the pistons were not set in a safe way but after they were put with the collar next to the horse he thought they were perfectly safe, and that he never gave plaintiff any directions as to which side of the trestle or horse he should stand.
The welder, testifying for defendant, said that when one end of the piston was being put on the horse, the foreman said "that don't look safe." Whereupon the welder replied "we will set it next to this collar where it will be absolutely safe." The foreman said, "Do you think it will move?" To which the welder replied, "I don't think there is any danger that way — I have cut them that way before." The foreman replied, "Well, that is" — but he was interrupted by a question asked him by defendant's counsel and he never completed the answer.
The welder said there might have been several safe plans to take it off, but whether plaintiff "done it the safe way, I don't know;" that if he had been himself doing it he would "probably stepped back far enough so I knew I was safe and kicked it over some how and got back far enough to know it wouldn't get me." He further said, "I don't know; if he got on the west side, it would probably have been safer than the east side." When asked why, he said, "Well, naturally, the horse would fall to the east ifanything happened to it."
The evidence in plaintiff's behalf was that the shove plaintiff gave the piston was to push it toward the end of the horse and off the horse in that way; that he didn't try to roll it because the way the end of the piston was on the floor the piston would slide easier than it would roll; that he didn't know the horse would turn over; and he *Page 28 
shoved it the way Richardson said they did; he had never done such work before.
There has been no attack made on the petition, or fault found with it in any way, either at the trial or here. Hence, it must be taken as it is and with all that it implies; and we think the allegations are broad enough to cover negligence of every character that the evidence may reasonably disclose as coming within the content of the general statement.
The evidence discloses that plaintiff was ordered by his foreman to take two heavy pistons, each weighing 700 pounds to the welder station to be cut off; that he did so, and, in the presence, and in fact under the supervision, of the foreman but at the personal direction of the welder, he was ordered to place one end of the pistons on the floor and the other end projecting over an iron horse to be there cut off; that the pistons were round and smooth and the back of the iron horse likewise round and smooth, and the foreman manifestly sensed the danger that the heavy piston leaning against such a horse of that height might cause the horse to fall, and hence the horse was placed so that its back came against a collar on the piston, which however was also rounding and might not afford any catch upon the round rod of the horse; and the foreman reasonably should have anticipated that this would in fact afford no protection against the horse's falling; that when the pistons were cut off, it was plaintiff's duty, and he was ordered, to take them off and convey them elsewhere; that the pistons were very heavy and the usual and ordinary way was to push them off of the end of the horse onto the low truck in order to convey them away; that when plaintiff attempted to do this in the ordinary way, and in the only way he knew, the horse suddenly fell toward him and slipped out from under the end of the piston and it instantly fell to the ground catching plaintiff's foot; that although plaintiff sought to take his foot out of the way, yet he was not able to do so because of the presence of a piece of iron behind his foot on the floor. We think that under such *Page 29 
evidence and the allegations in the petition above set out, the jury could have found not only that the leaving of the debris on the floor, so close to the work to be done, was negligence, but that the placing, or permitting the heavy piston to be placed, on such a horse in such an insecure and unstable position, was a lack of the exercise of ordinary care, and that the order for plaintiff to work in such a place and under these conditions was likewise negligent; and the jury could reasonably say that plaintiff's injury was the direct result of such lack of care. [Kantz v. St. Louis, etc., Car Co., 203 Mo. App. 522; Hunter v. American Brake Co., 231 S.W. 659; Glidewell v. Quincy, etc., R. Co., 208 S.W. 372; Hoke v. Buck's Stove, etc., Co., 234 S.W. 1061; Reese v. Loose-Wiles Biscuit Co., 224 S.W. 63; Henderson v. Wilson Stove Mfg. Co., 197 S.W. 177.] A negligent method of doing the work will make the master liable. [Yoakum v. Lusk, 223 S.W. 53.]
The contention that because plaintiff knew there were debris and scraps of iron on the floor, he is, therefore, conclusively presumed to be guilty of contributory negligence or to have assumed the risk, overlooks the fact that it was not simply the presence of the iron on the floor which produced the injury; but it was the negligent placing of the pistons in such an insecure and unstable position and the requiring of him to remove the piston from such a place amid such surroundings that caused the injury. In fact, it was the sudden careening of the horse that was the originating cause of all the trouble. We cannot say that, as a matter of law, plaintiff should have known that the trestle would fall. He had never done such work before and he did it in the only way he was told and the only way he knew. It cannot be said that plaintiff admitted he knew a better way at the time the work was done. Manifestly what plaintiff admitted was that, at the time of the trial, he supposed it would have been safer to have gotten on the west side of the trestle, but even then he did not know. And we do not think it can be said that conclusively the injury *Page 30 
would not have happened had he been on the west side. Moreover the foreman was standing there. The pistons had been placed as they were under his immediate supervision at the direction of the welder. The plaintiff cannot be deemed to conclusively know that the trestle would fall, nor was it so inherently dangerous that no reasonable man would have attempted to move it from where he stood, and the foreman saw and knew the plaintiff was obeying orders and yet gave him no directions as to how the pistons should be moved, but allowed him, unacquainted with the work, to move them in the way they usually were moved. While plaintiff knew there was debris on the floor behind him and all about him, he did not know that the horse would fall and make it necessary for him to jump back out of the way if he would escape. Nor could he anticipate that a shove in the direction it was given and from his position on the east side of the horse would cause the horse to fall to the east, or even to the west, since the shove was toward the north or toward the end of the horse.
In passing on the demurrer, every reasonable inference which the jury can rightfully draw in plaintiff's favor must be given. [Henderson v. St. Louis, etc., R. Co., 248 S.W. 987.] Where reasonable minds may differ, the question of contributory negligence is for the jury. [Schneider v. St. Joseph, etc., Power Co., 238 S.W. 468.] Contributory negligence is a question for the jury unless the court can say, as a matter of law, that no reasonably prudent man would have done as plaintiff did. [Algea v. Junge Baking Powder Co., 207 Mo. App. 687.] Under what occurred at the time plaintiff was ordered to remove the piston, he had a right to assume that the work and the place was reasonably safe and was not required to closely inspect the trestle before obeying orders. [Gilbert v. Hibbard, 222 S.W. 1027.]
As we have said, the evidence is that the injury primarily arose out of defendant's negligence in having the piston placed in an insecure and unstable position *Page 31 
and, under the Missouri rule, a servant does not assume the risk arising in this way. [Boroski v. Loose-Wiles Biscuit Co., 229 S.W. 424; Minter v. Gidinski, 228 S.W. 1075.]
The demurrer was, therefore, properly overruled; and the judgment should be affirmed. It is so ordered. All concur.