FRANK KOONSE, RESPONDENT, v. STANDARD STEEL WORKS COMPANY, APPELLANT.*

Kansas City Court of Appeals. December 5, 1927.

*Corpus Juris-Cyc References: Appeal and Error, 4CJ, section 2683, p. 750, n. 92; Damages, 17CJ, section 73, p. 741, n. 75; section 103, p. 779, n. 75; section 361, p. 1057, n. 56; section 381, p. 1075, n. 10; section 383, p. 1078, n. 33; section 443, p. 1112, n. 79; Master and Servant, 39CJ, section 1047, p. 836, n. 40; section 1074, p. 858, n. 66; section 1325, p. 1132, n. 35; section 1343, p. 1155, n. 14; section 1384, p. 1202, n. 68; p. 1203, n. 70; Trial, 38Cyc, p. 1693, n. 55.

*James S. Simrall, John F. Cook* and *Mosman, Rogers & Buzard* for respondent.

*Lawson & Hale* for appellant.

BLAND, J.—This is a suit for damages for personal injuries. Plaintiff recovered a verdict and judgment in the sum of $6000 and defendant has appealed.

The facts show that plaintiff, a man forty-one years of age, was on September 13, 1925, and ever since the previous January or February had been, employed by the defendant as a night watchman and janitor in its factory in North Kansas City. His hours were from six o'clock at night to six o'clock in the morning. His first duty when he came to work was to "punch a clock." A clock was carried by him on a strap around his neck; there were four keys which were located in various parts of defendant's factory. Plaintiff would go to the various keys, which were numbered from one to four, and insert a key in the clock which recorded the fact that plaintiff had been at that particular location at the time indicated by the clock. Plaintiff was required to visit every hour the places where these keys were located. When he was not engaged in punching the clock, his duties were to take care of the lawn, do janitor work in the main office and in winter to fire a low pressure boiler. He had nothing to do with the work in the main part of the factory other than to punch the clock. It was no part of his duties to clean up the shop. Defendant had a blacksmith shop situated in the southwest corner of the factory. An electric saw was located approximately opposite the center of the door of the blacksmith shop. This saw was used to cut angle iron and iron pipe, and scraps fell around the saw and would fall in a pile near the center of the door. At the time plaintiff was injured there was a pile of pipe consisting of thirty or thirty-five pieces of six to ten inches in length near the saw horse and in front of this doorway. On the outside of the door on the left-hand side, was some angle iron and pipe and on the other side some tanks of steel and other things. On the day in question plaintiff, while on his way to the blacksmith shop where one of the keys above described was located, was injured by reason of stepping on a piece of iron pipe about eight or ten inches long, located about a foot or a half of a foot beyond the pile. This piece of pipe rolled and threw him against some angle iron and thence on to the floor, injuring his left knee and back. The pile of pipe and the stray piece of pipe which caused him to fall were directly in the path that plaintiff was required to use in going to the

blacksmith shop, and it was impossible for him to go around the obstruction.

Plaintiff went to work at six o'clock on the night of September 13, 1925, and the first thing that he did was to make the six o'clock round which required him to go into the blacksmith shop and there punch his clock. On the first round he saw in front of the door and directly in his path the pile of pipe and he stepped over the pile without anything happening, also the eight and nine o'clock rounds but on the ten o'clock round he stepped on the stray piece of iron in question, resulting in his fall and injury. He was furnished with a lantern by the defendant, which was lighted by means of a storage battery. He did not use the lantern on the six and seven o'clock rounds because he did not need it, but used it on the eight o'clock round and found that the battery was so weak that it gave a poor light. By leaving the lantern unlighted for an hour the battery would recuperate to some extent and give a better light. To obtain a better battery, plaintiff would leave a note and during the day defendant would supply the lantern with a new battery. The lantern was in fairly good condition the night before his fall so he had not left a note. Plaintiff testified that at the time he was hurt the lantern provided a very poor light; comparing the light with that furnished by a match, he said that a ray of light was thrown three or four feet from the lantern; that he carried it on his arm or hand; that he held the lantern ahead of him and tried to see the best he could but was unable to see the piece of pipe that he stepped upon; that he knew that there was a pile of pipe there but had not seen this particular piece of stray pipe before and that he "stepped over the pile of pipe as carefully as I possibly could."

There was an electric lighting system in the factory. Plaintiff had been instructed by the general manager and superintendent not to turn on the electric lights in the plant as "it cost quite a bit to burn, cost probably seventy-five cents an hour to run the electric lights" and "he (the general manager) told me not to turn them on. He said, he furnished me with a battery and lantern to make my rounds." At one time when the lights were on he told plaintiff to turn them off. There was an electric light near the pile of iron in question and plaintiff could have turned it on but did not do so because he had been instructed not to turn the lights on. Plaintiff testified that he "could have turned them all on if I probably wanted to and lost my job." He further testified that he would have turned on the electric light if he had been allowed to do so.

The witness McGee testified that for about two years prior to May or June, 1925, he was employed by defendant; that his duties were "mostly cleaning up around there" during the day and in winter time he also fired the furnace; that part of his duties was to keep the "scrap cleaned out around the machines and do the sweeping;" that if he did not clean the scrap up around the saw and

other machinery, it was not removed; that there were times when he did not clean up the scrap because he did not have the time as defendant would tell him to help somewhere else and that would take him away from his cleaning work. Plaintiff testified that at the time he was injured he did not know whether a "clean up man" was employed by the defendant because the witness worked at night; that there probably was such a man but he did not know his name.

The petition charges three grounds of negligence; first, failure on the part of defendant to provide plaintiff a reasonably safe place in which to work in that defendant negligently and carelessly permitted iron pipe and other material to be and remain on the floor of the blacksmith shop where plaintiff was directed and required to work and walk; second, that plaintiff was required to work in darkness without sufficient light to enable him to see and observe the conditions and surroundings; third, that defendant refused and denied to plaintiff the right to use the electric lights and the electric lighting system which was in the factory.

Defendant insists that its instruction in the nature of a demurrer to the evidence should have been given for the reason that no negligence was shown on the part of defendant. We think there is no question but that there was evidence tending to prove at least the first charge of negligence contained in the petition. [Brown v. Ry. Co., 227 S. W. 1069; Campbell v. Aunt Jemima Mills Co., 211 Mo. App. 670; Pyle v. K. C. Light & Power Co., 246 S. W. 979; Arnold v. Graham, 219 Mo. App. 249; Soltes v. J. H. Belz Provisions Co., 260 S. W. 990; Cross v. C. B. & Q. R. R. Co., 191 Mo. App. 202; Reese v. Loose-Wiles Biscuit Co., 224 S. W. 63; Johnson v. K. C. Nut & Bolt Co., 172 Mo. App. 214; Porter v. Mo. Pac. R. R. Co., 267 S. W. 964; Hunter v. Amer. Brake Co., 231 S. W. 659.]

In this connection defendant insists that there was no notice actual or constructive to defendant of the existence of the scrap in the doorway. It may be inferred from the testimony that the pipe was permitted to get on the floor by the workmen at least as early as during working hours of the day upon which plaintiff was injured. The evidence shows that it was a common thing when pieces of pipe, angle iron and other such material were sawed off, for scraps to fall around the saw, some of it falling in a pile in the center of the doorway. Plaintiff testified that "he often found scraps of waste material and other substances over the floor of the factory;" that he found such material in "various places," "anywhere," "nearly every night" on his rounds. The witness McGee testified that at the time he worked for defendant he observed scraps of pipe lying around the saw; that the scraps fell on the floor in front of the door of the blacksmith shop; that frequently scraps were left on the floor in front of the shop door, that "if I didn't clean them up

when I was there, there were scraps there—there were times when I didn't clean the scrap up." Another night watchman, who at one time worked for defendant, testified that when he was making his rounds as night watchman, he frequently came upon piles of scrap on the floor; that "that condition existed pretty much all the time that I worked there;" that he worked there off and on for about a year and a half. From all of this testimony it appears, in the language of the defendant in its *original* brief, that the leaving of the scraps on the floor about the factory "was continuous." It appears that defendant made no serious effort to keep the scrap cleaned up and, of course, the showing of its long practice of permitting such material to be on the floor, was sufficient evidence of constructive, if not actual, notice to the defendant of the existence on the floor of such material as plaintiff fell over. From the uncontradicted evidence defendant must have known that such material was being left around where its employees might fall over the same.

It is insisted that the demurrer to the evidence should have been sustained for the reason that plaintiff was guilty of contributory negligence as a matter of law. In this connection it is claimed that plaintiff was not working under a foreman but was his own master; that he knew the situation fully; that "he knew that scraps of iron pipe and other scraps were everywhere" and "he knew that he might fall over them;" that "he could see the floor and anything on it for three or four feet by the lantern in its condition at the time of the injury;" that he walked over the same pile of pipe four or five times on the night that he fell and "did not push them to one side;" that "he knew that he would pass over them twelve times that night;" that he failed to "see a stray piece of pipe a foot, or half foot from the pile over which he says he fell;" that he could have easily switched on the electric light and by this method would have seen the pipe over which he fell and prevented his injury.

The rule is well settled that the servant is not required to discontinue to use his master's premises because they are in a dangerous condition. Unless the danger is so glaringly obvious as to threaten immediate and almost certain injury, he is not guilty of contributory negligence as a matter of law in continuing in the service. [Compton v. Louis Rich Const. Co., 287 S. W. 474, 482.] Although plaintiff knew of the existence of the pile of pipe in question, and similar scrap on the floor at various other places in the factory, he testified that there was no way for him to go around the pile of pipe in question and that he stepped over it and other scrap with which he came in contact as carefully as he possibly could; he compared the light furnished by the lantern to that shed by a match. Plaintiff testified to the effect that the light from the lantern was not of sufficient power to disclose the presence of the stray pipe. It is true that on cross-examination plaintiff was asked—

"Q. . . . How far did the lantern throw the light out on the floor so you could see the floor and see what was on it? and he answered, "Oh, I should judge three or four feet, or something like that.

"Q. From you? A. In front of me and I carried it along on my arm or hand."

He then testified that—

"Q. Stepped two feet possibly? A. Anyhow, I stepped three foot, an ordinary step or a little better, to step over this pile. . . .

"Q. You knew there was pipe on the floor and that's the reason you stepped over it as carefully as you possibly could? A. Yes, sir.

"Q. Did you try to see if there was anything under your foot? A. Yes, sir, I tried to see as I used my lantern, held my lantern ahead of me to see the best I possibly could.

"Q. Was there anything in your way? A. The pile of pipe was all I saw laying there together, one little round pile."

At first blush it might appear from the first part of this testimony that the light shown upon the stray piece of pipe over which plaintiff fell. However, when plaintiff testified that he "*judged*" he could see what was on the floor for a distance of three or four feet, "*something like that*" he was giving only an estimate and we do not think that this testimony is of such positive character as constituting a clear admission, during the trial of the case, such as would require an explanation before he could contradict. At the same time that he gave the testimony just referred to he stated, in effect, that the light did not shine on the piece of pipe in question because he stated that he was using the lantern to see with and saw only the pile of pipe. Whether he saw the stray pipe over which he fell was a question for the jury.

Plaintiff testified that the lantern was all right the night before and, therefore, under the method defendant had in furnishing a new battery, he was not guilty of negligence in failing to call for a new battery the day before his injury. While he had walked over the pile of pipe four or five times on the same night that he fell, he did not at any time notice the stray piece of pipe in question, which was some distance from the pile of pipe itself. While he testified that he did not push the pile of pipe aside with his foot, it will be remembered that it was not his business to clean up the factory and he stated that he did not remove the pile of pipe because, "I had all the work that I could handle." It will be remembered that defendant permitted scrap to remain on the floor all over the factory and had plaintiff cleaned up all of it that might have been in his way, he, no doubt, would have devoted an appreciable amount of time to such work. Defendant seems to think that it merely required one movement of the foot to have pushed the pile aside but there is no evidence to this effect. Assuming that if the pile itself

had been removed, plaintiff would not have fallen over the stray pipe, apparently it would have required some time to have removed the pile even though there were a place immediately adjoining the passageway where it could have been put, but the evidence is wholly silent on the question as to where it could have been placed. The fact that plaintiff found similar piles of scrap in various places in the factory, tending to show that defendant was not keeping the factory clean of such obstacles, would not convict him of contributory negligence as a matter of law in using the passageway into the blacksmith shop, for he was privileged to continue his work unless the danger was so glaring as to threaten immediate injury. [DeLate v. Loose-Wiles Biscuit Co., 213 S. W. 885; Mueller v. Ralston Purina Co., 254 S. W. 720; Head v. M. E. Leming Lumber Co., 281 S. W. 441; see, also, Heberling v. Warrensburg, 204 Mo. 604.]

As to his ability to turn on the electric light nearby, the evidence shows that he was forbidden by the defendant to do this. Defendant placed upon the witness stand its general manager who admitted that he told plaintiff "not to turn on all the lights in that plant at night . . . they cost money . . . I did not say to him at any time not to light the lights at all." It is argued by the defendant that he did not tell plaintiff that the latter could not light the lights under special circumstances. We think that plaintiff's testimony can be construed as showing that he was forbidden under any circumstances to light the lights. Defendant insists that the order of its officer could not be interpreted by plaintiff, as a reasonable person, as an order not to turn on the electric lights if the lantern failed or was weak. This was a question for the jury. The general manager testified that he told every night watchman in defendant's plant the same thing, "because when I was in the plant at night at various times I have noticed they are prone to do that very thing." It may have been the idea of the general manager that in order to prevent the lights in the plant from being used, and thus add to the expense of its operation, it would be better to forbid the watchmen to turn them on in any event, as, sometimes employees are not greatly interested in saving money for their employer and if permitted to turn the lights on at all, even if they were only needed for a short period of time, they might forget to turn them off when they were through with them. Plaintiff testified that he was told that he was furnished a light (the lantern) for his use. Under all the circumstances, as to what was meant by the defendant when it instructed plaintiff not to turn on the lights, was for the consideration of the jury. We have examined the case of Manche v. St. Louis Basket & Box Co., 262 S. W. 1021, cited by the defendant. That case differs from the case at bar in these particulars: In that case the box upon which the plaintiff stepped was furnished plaintiff and his co-employees by the master for a different purpose than that

which plaintiff was using at the time he was injured. The box was used for a purpose not intended and no notice was brought home to defendant that it had been left in the passageway.

It is insisted that the court erred in giving plaintiff's instruction No. 3, which reads as follows:

"The court instructs the jury that if you find the issues in favor of the plaintiff, it then becomes your duty to award to the plaintiff such a sum as you believe and find from the evidence will reasonably compensate him for the injuries, if any, he sustained at the time in question, and in this connection in the assessment of damages, you may consider his disability, if any, the pain and suffering, if any, occasioned by reason of said injuries, if any, and his future disability, pain and suffering, if any, which he is reasonably certain to suffer in the future, if any, by reason of said injuries, if any."

It is claimed that while the instruction tells the jury that in considering plaintiff's future disability, pain and suffering, they were limited to injuries that were occasioned by reason of the injuries "he sustained at the time in question" but in considering his present disability no such limitation is contained in the instruction; that the jury "undoubtedly understood the instruction to mean that they should consider his injuries at defendant's plant, his pain and suffering caused thereby, all in the light of his disability." The instruction properly permitted the jury to consider his present disability whether caused directly or indirectly by the injury in question for, as we will hereinafter point out, he was suffering from an injury to his right knee at the time he fell and this condition was aggravated by the injury he received to his left knee at that time. Defendant is responsible for any aggravation that may have been caused to the trouble that plaintiff was suffering from at the time he fell over the pipe. [Borowski v. Loose-Wiles Biscuit Co., 229 S. W. 424; Kiefer v. City of St. Joseph, 229 S. W. 1089.] It will be noted however that the instruction directs the jury's attention to the fact that it was the injury he sustained on September 13, 1925, that they were to compensate plaintiff for. They were only to consider his present disability in this connection. The instruction certainly was proper as far as it went and if for any reason defendant thought it was too general, the duty was upon it to offer a limiting instruction. [Soltess v. Provision Co., supra.]

It is insisted that the petition does not ask for damages for future pain and suffering while the instruction permits such damages. The petition alleges that plaintiff's left leg "has been rendered permanently stiff, sore, weak and lame." If plaintiff's condition is such as was pleaded in the petition, there would be necessarily future pain and suffering, and the instruction was not erroneous for including this item. [Hall v. Coal & Coke Co., 260 Mo. 351; Kroell v. Lutz, 210 S. W. 926.] In addition to this there was no objection to

the evidence that plaintiff would suffer future pain and suffering and under the Statute of Jeofails plaintiff would be entitled, even in this court, to amend his petition so as to plead future pain and suffering, and we will treat the petition as so amended. [Mellor v. Mo. Pac. Ry. Co., 105 Mo. 455; Ehrlich v. Mittelberg, 229 Mo. 284; Soloman v. Moberly Light & Power Co., 303 Mo. 622.]

It is insisted that the verdict is excessive. The evidence shows that when plaintiff was thrown by the iron pipe in question he sustained an injury to his back and left knee. He worked all night but was in "pain and misery." He used some Rexall white liniment and went to work the next night but was lame in his back and knee. On the morning after his injury he noticed a knot or swollen place on his left knee. Prior to the time he fell his left knee was in good condition; he had never had any trouble with it or his left leg. Six years before the trial of this case (it was tried on November 24th and 26, 1926), he received a fracture of his right knee by a heavy box falling on it, and this caused him to be lame in his right leg. Before the injury to his left knee he could favor the right one but since that time he cannot do so. His left knee has gradually grown worse. About a month or six weeks after receiving the last injury, he spoke to the secretary of the company and she sent him to the company's doctor, Dr. Dagg, who made an examination of him and sent him to Dr. Kuhn. Dr. Dagg treated him from sometime in October until he was "fired" by the defendant in April, 1926. His left knee is now in bad condition. It is stiff and pains him and there is a large knot on the knee "something on the order of a spavin on the side of a horse." He drags his left leg as he walks. In walking down steps he is compelled to pull himself along and in getting on street cars he has to crawl backwards. Immediately after he was injured his wife began to come at night and helped with his work.

His physician, Dr. Meirs, testified that he first saw plaintiff in July or August, 1926, that—

"The first thing that I noticed was that he had a considerable enlargement of the joint of his knee, with lack of mobility, and the lack of flexion of the joint. He has an inflammation of the synovial membrane of the joint itself, with excessive accumulation of synovial fluid, with an arthritis and an exostosis. There is an overgrowth of bony tissues. I am talking about his left knee. . . . I have seen him possibly ten or fifteen times at my office, and have recently examined his knee. The bony enlargement is larger, . . . and the flexion is diminished. The condition in his left knee is certain to be permanent. He had an accumulation of fluid in the right knee without the bony exostosis and without the separation of the cartilage in the knee joint. That condition might have been caused by injury. Other than the conditions I have

described about the knees, the general condition of his health is very good.

"The condition of his left knee is gradually getting worse. "Arthritis is synovitis, the arthritis in the bone proper. Synovitis is the membrane between the bones."

The doctor further testified that the effect of the injury to the left knee would tend to cause plaintiff to favor the joint that is most painful and—

". . . put more work on the other joint. If the joint (the right one) was diseased, which it had been, it would naturally make the condition worse. Of course, I mean by that after the left knee was hurt it was a greater burden thrown on the right, and when the right knee was hurt there was a greater burden thrown on the left. And if there was any defect in the knee or bone, or constitutional structure of any kind, the injuries to the right leg would tend to weaken the left leg and bring out the defects. . . . The only treatment you can give this man to give him a better leg now, is to remove the semilunar cartilage or all of the synovial membrane, in fact. A knee by a bone graft, taken from somewhere, any place where he has a bone, bring it through and fastening the two bones and making that joint absolutely stiff, thus stopping your process of infection of bone tissues.

"If he doesn't have some care of that knee of that nature the prognosis is very bad. The leg will become stiff and he will be unable to use it. It will become very heavy and he will not be able to walk. It will be very painful and every time he steps he tantalizes that already inflamed knee joint.

"Rest and immobilizing the leg, when the condition has come as far as this has, probably would not do any good at this time.

"In the treatment I have suggested he would be laid up from a year to a year and a half. This is my opinion on the subject."

He further testified that there was quite an active infection in the left knee which in his opinion was due to "trauma, a laceration of the tissues;" that the synovial membrane was torn loose and blood had gotten into the knee joint; that such blood would either be absorbed or become infected;" that—

"From constantly using a joint that was traumatized you will always get a breaking down of your blood clot that is in the knee joint proper with destructive arthritis."

That the infection comes from the blood stream. On recross-examination he was asked—

"Q. Then, if he had been properly treated immediately after this injury, and had been in good health, that blood would have been absorbed and he would have gone about his business with very little result? A. It isn't always absorbed. It depends on the amount of it. . . .

"Q. Now, then, if he had gone to a doctor immediately after that injury, and have been properly treated, and his leg not used for a short time, it would have, in all probability, been absorbed and gone on without even knowing anything about it afterward? A. As far as the infection is concerned."

Dr. Maltby testified that plaintiff had "traumatic arthritis and inflammation of the left knee joint . . . the knee is enlarged. There's quite a swelling on the outside of the knee cap, a projection there on the knee larger than a hen egg." That—"Underneath there's quite a looseness of the membrane with some grating, and when the knee is moved you get a crepitus or sort of a cracking or roughness to your hand when you feel it."

"The motion I should judge, is not half the usual motion of the left knee. In moving the knee it was painful, when you could not get it to a 45° angle, pain was very great when you tried to bend it."

It is apparent that plaintiff has received quite a serious and permanent injury and we cannot say that the verdict for $6000 is excessive under the circumstances.

However, defendant contends that the testimony of plaintiff's own doctor shows that if plaintiff had gone to a doctor for treatment immediately after the injury to his left leg, and been properly treated and his left leg not used for a short time, the infection would probably have been absorbed and as far as the infection was concerned, plaintiff would have gone on without knowing anything about it afterwards.

Plaintiff offered no excuse for not immediately consulting a doctor. His excuse for not sooner telling defendant of his injury was that he ". . . had a wife and three children to support and I was afraid of losing my job and getting fired in the winter time." We think the question as to whether or not the infection in his left knee would have been stopped or reduced by early medical attention in time to have materially lessened plaintiff's injury, was a question for the jury. Dr. Meirs testified that the infection was caused by the blood getting into the knee joint as the result of the tearing of the synovial membrane and that the infection was carried in by the blood stream. He testified on recross-examination that even if plaintiff had been timely and properly treated that the blood is not always absorbed, that "it depends upon the amount of it." He then testified that "as far as the infection is concerned" blood that went into the knee joint would have "in all probability been absorbed." The question as to whether the blood would or would not have been absorbed is left in a more or less indefinite state. It is not always absorbed for if the amount was too great it would not have been absorbed, but in all probability it would have been in this case. Why it would have been absorbed in this case is not

explained. This was merely expert testimony and on the face of it it is inconsistent. How can this court say as a matter of law that it would have been absorbed and therefore plaintiff's recovery was too great. We think under the testimony it clearly was a question for the jury.

There is no doubt but that if plaintiff neglected to use such means to effect a recovery as an ordinarily prudent person would use under the circumstances, he cannot recover damages for any aggravation of his injury growing out of such neglect; under such circumstances he would have been guilty of contributory negligence as far as the injuries are concerned. [17 C. J. 778, 779.] As before stated, we cannot say as a matter of law that his neglect, if any, in the case at bar, has contributed to or aggravated his injury.

The judgment is affirmed. *Arnold, J.,* concurs; *Trimble, P. J.,* absent.