LOUIS S. TASH v. ST. LOUIS-SAN FRANCISCO RAILWAY COMPANY, Appellant.—76 S. W. (2d) 690.

Division One, November 16, 1934.

*E. T. Miller* and *Mann, Mann & Miller* for appellant.

1150

*Atwood, Wickersham & Chilcott* for respondent.

1152

FERGUSON, C.—Plaintiff was employed by the defendant railway company, at Monett, Missouri, as "an engine hostler." In the course of that employment he was injured and brought this action, under the Federal Employers' Liability Act, for damages, for the injuries sustained. A verdict for plaintiff was returned, and judgment entered thereon, assessing damages at the sum of $8000 and defendant has appealed. The applicability of the Federal Employers' Liability Act is not challenged.

Appellant's first contention is that its demurrer to the evidence should have been sustained and that the trial court erred in refusing to direct a verdict for defendant. This necessitates a resume of the evidence, especially that adduced by the plaintiff. It was the duty of the engine hostler to move the incoming locomotive engines from the yard to the roundhouse and the outgoing engines from the roundhouse to the yard and see that they were there properly serviced with water, sand and fuel and placed for the outgoing trains. Twenty-one roundhouse tracks converge at and extend, fan-shaped, south from a turntable located north of the roundhouse premises. All engines in going from the yards into the roundhouse premises or from there to the yards pass over the turntable and thence onto the proper track. Fifteen of these tracks lead into the roundhouse building each through a separate doorway; six tracks, which are not enclosed, are located in an open space west of the roundhouse; this portion or part of the premises is known, and referred to, as the garden. These twenty-one tracks are numbered from east to west, 1 to 21 respectively. The same space or distance between the tracks, with aisles or passageways, and arrangement and

construction of the tracks maintained in the roundhouse building exists in the garden. The aisles between the tracks in the garden were made of chat and cinders and were maintained as passageways for the use of the employees in going to and from, and in their work about, the engines. These passageways "were eight to ten feet" between the rails of the track and when engines were standing on the tracks were narrowed to, the extent of the overhang of the engine or to probably six feet in width. Under most of these tracks, both in the roundhouse and the garden, there is a pit for facilitating work on the engines stored thereon. These pits are constructed of concrete, are three and a half to four feet in depth and vary in length from eighty to one hundred and ten feet. When a locomotive is taken into either the roundhouse or garden, over the turntable, it is driven in "head on," the front toward the south, and stopped over the pit with the rear end of the tender from four to ten or twelve feet south of the north end of the pit; that part of the pit thus left open or uncovered affording a means of access to or exit from the pit for men, tools and materials in working under and about the engine standing thereon. The space north and immediately in front of the roundhouse was lighted at night by four electric "flood lights" placed at intervals along the top and north side of the building. Another electric "flood light" located on the top of the roundhouse at the northwest corner thereof faced to the west and downward so as to illuminate the garden. In addition there was a two hundred-watt electric light with a reflector suspended, at about the height of a locomotive, at the south end of each of the aisles or passageways between the tracks in the garden. The lights were controlled by switches located in or near the office in the roundhouse. Plaintiff worked from four o'clock in the afternoon until midnight. His duties as a "hostler" have been stated. He was injured about 7:40 or 7:45 P. M., January 22, 1930. The weather had been very cold for some days preceding; snow covered the ground; the snow in the aisles or passageways between the tracks in the garden was, however, "packed down by the men walking over it." On this night "it was about fifteen degrees below zero" and defendant's employees, to whom such duty was assigned, "kept steam up on these engines" in the garden. While the engines were in the garden mechanics and enginemen went upon and worked about the engines at various times making inspections, keeping up the steam, servicing the engines and maintaining them in readiness to be moved out of the garden upon assignment or as ordered. The maintenance and servicing of these engines was no part of plaintiff's duties. He merely moved the incoming engines from the points in the yards where they had been placed when detached from incoming trains to the roundhouse or garden and there placed the engine on the proper track or moved outgoing engines from the

roundhouse or garden to the yards, and there after supplying the engine with fuel, oil or coal, sand and water "parked" it at the proper place so it could be attached to outgoing trains. Plaintiff testified that "the instructions were to blow the engines down four or five times each night while they were in the terminal." The "blowing off" of steam and hot water at intervals is referred to in the evidence as "blowing," "blowing out," "blowing off," and "blowing down" the engines. As stated, plaintiff testified this was required four or five times "each night while" an engine was "in the terminal." The "terminal" includes the yards as well as the roundhouse premises. To "blow off" or "blow out" the engine it was necessary to open the "blow off valve" which is underneath the engine and is opened by the operation of a lever in the cab. When the lever is "pulled" the "blow off valve" opens and steam and hot water is discharged under and at the side of the engine. Plaintiff stated: "I am familiar with the operation of the blow off cock; it is opened by jerking it open; it makes a noise . . . a loud enough sound that you can detect it to be a blow off cock. This blow off cock could not open without somebody pulled on it." Plaintiff further stated that there was in each pit "a big pipe" which connected with a "big boiler;" that this "big pipe" was installed in the pit for the purpose of carrying off the steam and hot water which was discharged when an engine was "blown off" while standing on a pit track; that the "rules" and "instructions" required that an employee making such "blow off" "connect" the engine "up to the big pipe." It is evident that by making the connection with this pipe when a "blow off" was made steam and hot water would be discharged into and carried off by the pipe but if the connection was not made the steam and hot water would be discharged into the pit and underneath and at the side of the engine and would likely envelop and injure workmen who might be, at the time, about or near the engine or upon the passageways between the tracks and pits. In this connection plaintiff stated, in effect, that the engines were "blown off" in the yard before being taken to the roundhouse or garden and after being returned there from the roundhouse or garden and also at times while standing in the roundhouse or garden. Defendant's evidence as to the "blowing off" of the engines will be hereafter referred to. Here we set out certain questions and answers appearing in the cross-examination of plaintiff:

"Q. It was not an unusual thing for an engine to be blown off any time while standing on one of these pit tracks is it? A. Well, they blow them down there, yes sir.

"Q. But it is done; you see it done frequently? A. It is done, yes sir; it is not instructions. It is against the rules. . . .

They are supposed to connect them up to the big pipe connected to a big boiler.

"Q. Now they hadn't been doing it that way? A. No, sir."

Plaintiff stated that it was his "custom and practice" before eating his supper to take the engine which was "to protect" trains Nos. 6 and 10 "due in there" (Monett) at 9:15 P. M., and 11 P. M., respectively, out of the garden and into the yard, "get fuel, water, and sand" and "leave the engine furnished at the coal chute" in the yard so that if trouble had developed in the engine on either of said trains, 6 or 10, and it was necessary to take it out of service this engine would be ready and immediately available as a substitute; that engine 1510 was then being used "to protect" trains 6 and 10; that said trains were interstate passenger trains and engine 1510 was used only on interstate trains; that on this night, and about 7:30 P. M., he and his helper brought engine 4027 from the yards into the roundhouse, placed it on the proper track in the roundhouse and then leaving his helper "to write engine 4027 up on the board" he went to get engine 1510, which was in the garden, intending to take it from the garden into the yards, supply it with fuel, water and sand and place it ready "to protect trains 6 and 10;" that the electric lights which lighted the garden and the roundhouse premises had not been turned on that night and that the garden was shrouded in darkness and he did not have a lantern. Engine 1510, an oil burning engine, was standing on track 20 in the garden and engine 834, a coal burning engine, on track, 21, the next track to the west. The north end of engine 834 was about 12 feet south of the north end of the pit under track 21 leaving that part of the pit open. Plaintiff testified that he went west from the roundhouse, across the garden, passing to the north of the engines standing on the tracks east of track 20, until he reached the aisle or passageway between tracks 20 and 21 and then south along that passageway; and that, "when I got in between these two engines, 1510 and 834" the "blow off cock" on engine 1510, without any warning being given, was opened and a "fog of steam and hot water rolled up there . . . I whirled to get out of it and stumbled on some coal and fell in the engine pit (under track 21 and back of engine 834) alighting on my right shoulder and head. When I fell into that pit it knocked me unconscious; everything went dark. I found myself in this pit trying to get up and in trying to get up I laid my hand on some chunks of coal in there. . . . I felt the coal in the pit . . . There was a chunk of coal in that pit as big as my head . . . I kicked the coal into the pit. I heard it go in, heard it hit the wall and some of the chunks bursting. When I regained consciousness down in that pit I was sick, fainty, dizzy, . . . had pain in my head and right shoulder. I climbed out of there and went to the roundhouse office. I was staggering." Plaintiff says that he was

met at the office by the general foreman, Mr. Garrison, and other employees whom he named and after about twenty minutes one of his fellow employees took him home in a car. The evidence as to the nature and extent of the injuries will be set out when we reach the assignment appellant makes that the verdict "is grossly excessive." The presence in the passageway of the coal, against or upon which plaintiff stumbled, is explained and accounted for by plaintiff's testimony in this way. The roundhouse was heated with stoves and there were at least fifteen coal burning stoves in the roundhouse, one in each aisle and stoves in the offices. The coal used in these fifteen, or more, stoves was obtained from the tenders of coal burning engines standing in the roundhouse and garden. In getting coal for the stoves the employees, whose duty it was to maintain fires in the stoves, would go upon the tender of a coal burning engine in the roundhouse or garden and throw coal from the tender "down upon the walk, in the aisle" or passageway between the tracks then "wheel it to the stoves with a wheelbarrow" and they would "let this coal," thrown from the tenders "lie there" in the passageway "until they used it up by wheeling it from one stove to another with the wheelbarrow." Necessarily in maintaining fires constantly in the fifteen or more stoves, throughout the day and night, during the extreme cold weather which prevailed on the date of plaintiff's injury, and for several days next preceding that date, a large amount of coal was taken from the tenders of coal burning engines in the roundhouse and garden. The employees engaged in maintaining the fires in the stoves would "get the best coal." Ofttimes the coal thrown into the passageway would not all be removed and some pieces of coal would be left scattered along or about the passageway at the point where the coal had been thrown from the engine tender. Further the engines were supplied with fuel before being taken into the roundhouse or garden and sometimes pieces of coal would fall from the tenders of the coal burning engines as they were being placed. It was not part of plaintiff's duties to inspect the passageways for, or "clean up," the coal which might be thrown and left there by the employees in charge of maintaining fires in the stoves or which might fall from the tenders. Plaintiff testified that, "they (the defendant railway company) had a man" whose duty it was "to keep that coal cleaned up" and also that after an engine was placed in the roundhouse or garden "it was the fire builder's duty to come and look around those coal burner engines to see if any coal rolled off on the ground . . . and clean up coal that rolled off these coal burner engines." Defendant's general foreman at Monett who was employed in that capacity at the time of plaintiff's injury and prior thereto testified: "We have laborers on the day shift from eight A. M. to four-thirty P. M., that clean between every pit of any dirt, trash, coal or anything else that might accumulate on the premises."

Engine 834, a coal burning engine, had been standing on pit-track 21 for about an hour and a half preceding the plaintiff's fall into the pit when he "stumbled on some coal" and at least presumably that track had been in use throughout the day. The work in the roundhouse and garden seems to have been continuous day and night. Defendant's general foreman, Garrison, was the principal witness in its behalf. He stated that engine 1510 was the regular engine assigned to train 2 which left Monett at four A. M. and, inferentially at least, denied plaintiff's testimony that it was the custom to set engine 1510, or any other engine, out "to protect" trains 6 and 10. He said, however, that if any trouble had developed with the engine on either train 6 or 10 "they would have sent us a wire and we would have prepared engine 1510" to substitute but "we received no such wire." He admitted that a hostler would take an engine out of the roundhouse or garden "to get it ready for a run two to three hours before time for the train to depart." The witness said, and he was corroborated in this respect by several other employees of defendant called as witnesses for defendant, that the "lights were all on in the roundhouse and garden" at all times that night. He further testified that the work "of cleaning up coal or any other obstruction around the tracks from the turntable up to the stalls" was taken care of by a "day shift" of "laborers" "between 8 A. M. and 4:30 P. M.," but "there was no one working at nights for that purpose;" that shortly after plaintiff came to the office and reported that he had fallen into the pit under track 21, and the circumstances thereof, he made "an examination of the ground around pit 21" but "did not see any coal or any other object lying on the ground, saw no coal there at all;" that he had personally interviewed "all of the men who were working there that night" and "did not find any man who had been on engine 1510, for any purpose, for an hour prior to the time Tash came into the office." Concerning the "blowing off" of engines Garrison testified that engines were not "blown off in the garden or roundhouse;" that the "instructions were" that the engines be "blown off" by the hostler "in the yard inbound" and "he does the same thing outbound after the engine has been removed from the roundhouse or garden;" and that "these engines are blown off, by the hostler, below the coal chute or in that vicinity (in the yard) on flat track where there are seldom any employees. That is on engines first turned in off the road and before they come across the turntable and go into the roundhouse or the garden. After the engine is prepared for service in the roundhouse or in the garden it is moved (by the hostler) across the turntable (into the yard) to the water crane where the hostler gives it water and at that time opens the blow off cock." This testimony of the foreman relative to the instructions concerning, and the method and practice of, "blowing off the engines" is corroborated by two other

employees who testified as witnesses for defendant. Plaintiff's helper called as witness for defendant testified that, when the hostler (plaintiff) was ready to move an engine from the roundhouse or garden he would "get on the engine and get ready to back it out, then whistle for me;" that on the night Tash was injured he and Tash took engine 4027 into the roundhouse "about 7:55 P. M.;" that Tash then said: "We are caught up with our work" and "we better eat lunch;" that nothing was said at that time about "getting engine 1510 out;" that Tash left the roundhouse and as the witness "thought" started home to supper; that the witness "started to eat lunch;" and that "Tash most generally went home for supper as he lived on the hill just south of the roundhouse." Defendant's witness, Schucht, an employee in the roundhouse and garden testified that it was his "duty to turn on the lights;" that he "turned on both the flood lights and the pit lights that evening as soon as it got dark enough" and "the lights were on all the time" after that; that he was on engine 1510 "somewhere about five or six o'clock" to see about the fire and that there was "plenty of water in the boiler" and that he had "similar work to do on other engines." Defendant's witness West, employed by defendant as an inspector, stated that he worked on engine 834 on pit 21 "about 7:30 that night;" that, "I got on the engine somewhere around seven-thirty or seven . . . it took me something like twenty minutes" and that he did not hear the "opening of a blow off cock or steam escaping from any engine around there while I was there." Defendant's witness, Goodnight, said he worked in the garden that evening on engine 834 "between 7:30 and 8 o'clock" and that he "didn't see Tash out there at all that evening" and "didn't hear any outcry or any sound while I was working out there."

The petition alleges, that as plaintiff, in the performance of his duties, attempted to pass down the walk or passageway between pits 20 and 21, it was dark; that said premises, walk and pits "were not lighted;" and that there was no guard rail about said pits; that the "walk was rough, icy, uneven, out of repair," etc; that "when he reached a point on said walk aforesaid near to well" or pit 21 "great volumes of hot steam and vapor were suddenly ejected from an engine standing over one of said pits and that defendant, its agents, servants and employees negligently and carelessly caused and permitted a lump or lumps of coal to be and remain upon said walk and by reason of the aforesaid facts and conditions plaintiff was blinded and caused to slip, stumble and fall over the edge of and into said well or pit." The petition then specifically charges as negligence; (1) failure to light the walk and pits; (2) causing and permitting hot steam and vapor to be ejected and escape; (3) causing and permitting coal "to be and remain at the place aforesaid;" (4) failure to have a guard rail about the pit; and (5) failure to

keep the walk lighted, and in repair, smooth and even, etc. It is then alleged that "by reason of the conditions aforesaid" "existing at said time and place" the walk or passageway was dangerous and not resonably safe and that "defendant negligently and carelessly failed and omitted to furnish plaintiff a reasonably safe place to work." The answer is a general denial and a plea of assumption of risk. The other charges of negligence having been abandoned by plaintiff the two charges of negligently causing and permitting steam and vapor "to be ejected and escape at said time and place" and negligently and carelessly placing and permitting "lumps of coal" to remain in and upon the passageway "at the place referred to in the evidence," were submitted to the jury, in the conjunctive, by plaintiff's instruction numbered 1.

Our review of the action of the trial court in refusing the demurrer to the evidence is confined to a determination of whether there is substantial evidence to support the grounds of negligence submitted as a basis of recovery. We look not only to the evidence adduced by the plaintiff and the natural and reasonable inferences arising therefrom but also to any evidence on the part of the defendant that tends to corroborate or aid plaintiff's case. The rather full and detail statement of the evidence we have made, supra, would seem to make an extended analysis thereof here unnecessary and to demonstrate that the evidence was sufficient and of such a substantial character as to warrant the submission of either and both of the grounds of negligence submitted to the jury. But so strenuously does appellant press its demurrer we are impelled to further discuss the facts. First as to the discharge of the steam. It was customary and the company's instructions required that the engines maintained under steam in the terminal be "blown off" several times while in the terminal. Defendant's foreman said the instructions were that engines be "blown off" by the hostler, at certain points only in the yard "where there are seldom any employees" about, before they were taken across the turntable into the roundhouse or garden or when returned to the yard from the roundhouse or garden. Inferentially at least his testimony is to the effect that the "blowing off" of an engine in the garden, in the manner in which plaintiff states this engine was "blown off" would have been improper and contrary to the instructions. Plaintiff's testimony is that engines were "blown off" in the roundhouse and garden as well as in the yard and that the instructions and rules required that in doing so the engine be connected with the pipe in the pit into which the steam and hot water could be discharged and carried away but that engines were ofttimes "blown off" in the garden without making this connection. The evidence shows that this engine 1510 had been standing in the garden for more than three hours prior to the time plaintiff fell in the pit. Defendant's employees went upon this en-

1160

gine, and the other engines in the garden, for the purpose of maintaining steam, making certain tests, inspections and any slight repairs that might be required. Only employees of defendant were permitted in or about the roundhouse and garden premises; trespassers were forbidden and there is no evidence that on this night any person other than defendant's employees was on or about the premises. There is no evidence tending to show, nor claim made, that the ''blow off'' valve on this engine, or the appliance by which the steam and hot water was ejected, had become or was out of order or defective so that it might have opened or the steam and hot water have been suddenly ejected without the lever in the cab, by which the blow off valve was opened, being operated by someone. On the other hand all the evidence was that the ''blow off cock'' could only be opened by someone in the cab of the engine operating the controlling lever which was located there and that when the ''valve'' was opened it would ''make a noise . . . . it is a loud enough sound you would detect it to be a blow off cock.'' Plaintiff testifies positively that the ''blow off cock'' was opened, that he heard it open and that, without the connection being made with the carry off pipe in the pit, as required by the rules, the engine was ''blown off,'' and the steam and hot water ejected into and across the passageway. Plaintiff could not see into the cab of the engine. The facts and circumstances in evidence, we think, warranted an inference by the jury that the engine was ''blown off'' by one of defendant's employees notwithstanding the testimony of defendant's foreman that he interviewed ''every man'' who worked that night on and about the engines in the roundhouse and garden and that each had assured him that he was not in the cab of engine 1510 at that time and had not been on that engine within an hour prior thereto. The admissibility of that testimony is not before us and it went to the jury to be weighed and considered, accepted or rejected, along with the other evidence in the case and accorded such value as the jury saw fit to give it. But certainly such testimony did not establish indisputably that none of defendant's employees operated the lever in the cab of the engine, the only way the blow off valve could have been opened, and ''blew off'' the engine nor foreclose as a reasonable inference from the facts and circumstances in evidence that some employee of defendant did so. Further the evidence warrants the conclusion that defendant's employees working upon the engines in the garden knew that other employees were or might be working in and about the engines in the garden and using the passageways provided and maintained for their use in carrying on their work. There was, we think, ample evidence upon which the jury might properly find that an employee of defendant negligently ''blew off'' the engine, i. e., that in ''blowing off'' the engine at that time and place and without first connecting it with the

carry off pipe and without giving any warning or ascertaining whether any fellow employee was near he failed to exercise that degree of care which the conditions and surrounding circumstances required. We turn now to the sufficiency of the evidence to warrant the submission of negligence on the part of defendant in causing and permitting the lumps of coal, over or against which plaintiff stumbled, to be and remain in the passageway. It was the nondelegable, continuing duty of defendant to use ordinary care to provide and maintain a reasonably safe place for plaintiff to carry on his work. The alleged violation of that duty of the master is the real gist of this action. The presence of the coal in the passageway was accounted for by plaintiff's evidence. There was evidence from which the jury could find that defendant's employees in charge of maintaining continuous fires in the fifteen or more stoves left there some of the lumps or pieces of coal which they had thrown into the passageway in obtaining coal from the tenders of the coal burning engines. The act of these employees in this respect was that of the master. Defendant does not undertake to explain otherwise the presence of the coal in the passageway unless it had fallen there from the tender of a coal burning engine. In fact defendant merely denies that there was any coal in the passageway at the place where defendant says he stumbled and fell. Plaintiff testified that it was the duty of the fire builders to "come and look around" the "coal burner engines to see if any coal rolled off on the ground" and "clean it up." Engine 834, a coal burning engine had been standing on track 21 for an hour and a half prior to the time defendant fell. Engine 1510, on track 20, it will be recalled, was an oil burning engine. If the coal in the passageway fell from the tender of the engine 834 when it was moved onto track 21 and placed over that pit at least an hour and a half had elapsed and the fire builder had evidently not inspected the space about the engine and had not cleaned up the coal as was his duty. But if the fire builders' duty in this respect be considered merely incidental it must be remembered that plaintiff testified that defendant employed men whose duty it was to keep the passageways free of obstructions and "to follow those engines in there and keep that coal cleaned up." Concerning this, however, defendant's foreman testified that defendant employed men who worked from eight A. M. to four-thirty P. M., and whose duty it was to clean between every pit," that is the passageways or walks and keep them clean of "trash, coal or anything." The same type and character of work and engine movements went on continuously in the roundhouse and garden both day and night. As this ground of negligence was submitted to the jury by plaintiff's instructions the jury were required to find "that defendant, its agents, servants and employees were negligent and careless in placing and permitting to be placed and remain the lumps of coal referred to in the evidence

and that plaintiff's working place was thereby rendered dangerous and not reasonably safe.'' There was, we conclude, substantial evidence to take to the jury the question, thus submitted, whether defendant's employees negligently caused and permitted the coal to be and remain in the passageway and sufficient evidence of a substantial character to warrant the finding by the jury, as a reasonable inference, that the coal had been placed or thrown into the passageway by defendant's employees and permitted to remain there. [See Lock v. Chicago, B. & Q. Railroad Co., 281 Mo. 532, 219 S. W. 919; Glidewell v. Quincy, O. & K. C. Railroad Co., 208 Mo. App. 372, 236 S. W. 677; Brown v. St. Louis-San Francisco Railroad Co. (Mo. App.), 227 S. W. 1069; Laughlin v. K. C. Southern Ry. Co., 275 Mo. 459, 205 S. W. 3; Kelly v. U. P. Ry. Co., 141 Mo. App. 490, 125 S. W. 818; Smith v. So. Ill. & Mo. Bridge Co., 326 Mo. 109, 30 S. W. (2d) 1077; Koonse v. Standard Steel Works Co., 221 Mo. App. 1231, 300 S. W. 531; Milzark v. National Biscuit Co. (Mo. App.), 259 S. W. 832; Hawkins v. St. L. & San F. Railroad Co., 189 Mo. App. 201, 174 S. W. 129.]

While discussing the sufficiency of the evidence to make a case for the jury, and in that connection, we will note appellant's contention that the trial court erred in refusing its Instruction D 4, directing a verdict for defendant on the theory that, as a matter of law, under the evidence, plaintiff assumed the risk of injury. Looking to the law of assumption of risk as stated by the Supreme Court of the United States it is said in Chesapeake & Ohio Railroad Co. v. De Atley, 241 U. S. 462, that it is not the duty of an employee ''to exercise care to discover extraordinary dangers that may arise from the negligence of the employer or of those for whose conduct the employer is responsible, but the employee may assume that the employer or his agents have exercised proper care with respect to his safety until notified to the contrary, unless the want of care and the danger arising from it are so obvious that an ordinarily careful person, under the circumstances, would observe and appreciate them.'' In Gila Valley, Globe & Northern Ry. Co. v. Hall, 232 U. S. 94, it is said: ''The employee has a right to assume that his employer has exercised proper care with respect to providing a safe place to work'' and it is there held and also in Chesapeake & Ohio Railroad Co. v. Proffitt, 241 U. S. 462, that the employee ''is not to be treated as assuming a risk that is attributable to the employer's negligence until he becomes aware of it, or it is so plainly observable that he must be presumed to have known it.'' The Federal rule of assumption of risk stated in Toledo & Western Railroad Co. v. Allen, 276 U. S. 165, is that, except as specified in Section 4 of the Employers' Liability Act eliminating the defense in certain cases, ''the employee assumes the ordinary risks of his employment and when obvious or fully known and appreciated by him the extra-

ordinary risks and those due to the negligence of his employer and fellow employees.'' [See Jenkins, Admr., v. Wabash Ry. Co., 335 Mo. 748, 73 S. W. (2d) 1002, and the compilation of Federal cases on assumption of risk found in Webber v. Terminal Railroad Assn., 335 Mo. 11, 70 S. W. (2d) 863.] The facts of the present case considered in the light of the Federal doctrine of assumption of risk we find no error in the action of the trial court in refusing to declare, as a matter of law, that plaintiff assumed the risk and to direct a verdict on that ground. Assumption of risk was, under the facts, a question for the jury and was properly submitted under appropriate instructions.

▪ Appellant complains of plaintiff's Instruction 1, submitting in the conjunctive two alleged specific acts of negligence, i. e., the discharge of steam and the ''placing and permitting . . . lumps of coal . . . to be placed and remain at the place referred to in the evidence.'' The instruction tells the jury that if they find ''that as plaintiff approached said engine great volumes of vapor and steam were suddenly ejected from the engine . . . and the atmosphere thereabout became so thick and dense that plaintiff was blinded thereby and unable to see his whereabouts, if so, and that while plaintiff was in said steam and vapor as aforesaid and unable to see his way about he stumbled and fell over said lumps of coal . . . and that defendant, its agents, servants and employees were negligent and careless in causing and permitting said steam and vapor to be ejected and escape at said time and place and were negligent and careless in placing and permitting to be placed and remain the lumps of coal at the place referred to in the evidence, if so, and that plaintiff's working place was thereby rendered dangerous and not reasonably safe . . . then your verdict will be for plaintiff.'' We have held that the evidence was such as to warrant the submission of both alleged acts of negligence. However, appellant argues that the jury might well have found that the discharge of steam under the circumstances was not negligence and that the court therefore erred in refusing its Instruction D 10, that if the jury found ''that no steam negligently escaped from engine 1510 while plaintiff was between tracks 20 and 21 and immediately before he fell'' the verdict ''must be for defendant.'' It seems readily apparent that by his Instruction 1 plaintiff assumed an extra or unnecessary burden and assuming that while the jury found and believed the steam was discharged at the time and place, as stated by plaintiff, the discharge thereof was not, under the circumstances, a negligent act, yet the jury was warranted in its finding against defendant on the ground that defendant negligently placed and permitted lumps of coal to be placed and remain at the place in the passageway where plaintiff in trying to avoid the steam and hot water stumbled against them and was thereby caused to fall into

the pit. The trial court therefore did not err in its refusal of defendant's Instruction D 10. Plaintiff might, without prejudice to defendant, have omitted from his Instruction 1, the requirement that the jury find that the discharge of the steam was negligence. "Requiring the jury to find for plaintiff on two grounds of negligence when only one of the two is necessary, is not error. It is merely requiring the jury to find negligence as to an unnecessary matter." [Berry v. Baltimore & Ohio Railroad Co. (Mo.), 43 S. W. (2d) 782.]

Plaintiff's Instruction 3, relates to assumption of risk. It does not direct a verdict but fully and correctly states the applicable rules of law governing assumption of risk nor does appellant contend otherwise. But appellant criticises the statement therein that, "when plaintiff entered the service of defendant he had a right to assume that defendant would exercise ordinary care in the conduct of its business." Appellant says by that language the instruction "assumed the existence of a fact the truth of which" should have been left to the determination of the jury. In reading the instruction as a whole we are not impressed with the argument that the language thus segregated and complained of could have influenced the jury to the defendant's prejudice nor do we think it can be said to assume as established a controverted issue of fact in the case. The cases cited by appellant have been examined. They are representative of that line of cases wherein the instruction clearly assumes the existence of some controverted and essential issue of fact.

Appellant assigns as error the refusal by the trial court of its Instruction D 14. The instruction in effect directs the jury that to find the defendant "guilty of negligence on account of the presence of said piece of coal" they "must find that it had been in that place for such a length of time that an ordinarily prudent person . . . would have known that it was there." The instruction wholly ignores plaintiff's theory of negligence in respect to the coal and if given would have been in conflict with plaintiff's instruction correctly submitting his theory that the defendant's employees in the first instance placed or caused the coal to be and remain in the passageway rendering plaintiff's place of work unsafe and that in so doing defendant's employees were negligent.

Defendant offered but the trial court refused an accident instruction. Appellant claims error. Without further reviewing the evidence it suffices to say that we find no basis in the evidence for such an instruction. In ruling this assignment against appellant we are following, Hogan v. Kansas City Public Service Company, 322 Mo. 1103, 19 S. W. (2d) 707; Sloan v. Polar Wave Ice & Fuel Co., 323 Mo. 363, 19 S. W. (2d) 476; Wright v. Quattrochi, 330 Mo. 173, 49 S. W. (2d) 3; Mitchell v. Dyer (Mo.), 57 S. W. (2d) 1082; Brewer v. Silverstein (Mo.), 64 S. W. (2d) 289, and our recent

case of Goodwin v. Missouri Pacific Railroad Co., 335 Mo. 398, 72 S. W. (2d) 988, 994.

■ Defendant's general foreman, Garrison, testifying on direct examination stated, that he was in the office when plaintiff came there and "told me he had fallen in a pit and his right shoulder was injured;" that plaintiff said he fell into pit twenty-one; that "we took off his jumper and I had him work his arm. I wanted to ascertain whether or not his arm was broken. His clothing was dry." Whereupon this question was propounded: "If a man had been close to an engine a short time before that and a blow off cock had been opened and a great quantity of steam had been emitted from that engine sufficient to have enveloped him would that steam have been sufficient to wet his clothing?" Plaintiff's objection was sustained on the ground that the "matter was not a subject for expert" or opinion testimony. This ruling of the court is assigned as reversible error. We are inclined to the opinion that the trial court did not fall into error in ruling that the matter was not a proper subject for opinion testimony. The witness had stated that plaintiff's clothing was dry. If the jury saw fit to accept the statement of the witness in that regard the inference, favorable to defendant, arising therefrom is one which a jury could well make without the necessity of opinion evidence to assist them. In view of that situation even if it be conceded that defendant was entitled to have the witness tell the jury that in his opinion if a great quantity of steam had enveloped plaintiff immediately before he entered the office it would have "been sufficient to wet his clothing" the rejection of the testimony could hardly be deemed in itself of such a prejudicial nature and effect as to amount to reversible error.

■ The remaining assignments have to do with the instruction on the measure of damages and the amount of the verdict and therefore require that we examine the evidence relating to the injuries sustained. We have stated that plaintiff testified that upon regaining consciousness he "climbed out of the pit and went to the office." Continuing a review of his testimony concerning his injuries and subsequent pain and suffering he states that during the time he was in the office (about 20 minutes) awaiting arrangements to take him to his home he suffered pain in his back, head and right shoulder; that shortly after he reached his home Dr. West arrived there; that Dr. West manipulated his "crippled arm" which was "very painful" and gave him "a bottle of rubbing alcohol" with directions to "bathe the arm with alcohol;" that he continued to suffer pain in the shoulder and arm; that "it seemed like a heavy weight was pulling down on my arm" and "my arm felt numb and hurt me in the shoulder;" that he couldn't "try to use" his arm; that about a week passed before he again consulted a doctor when he called on Dr. West but Dr. West "did not give me any treatment or instructions

so I put my arm in a sling for convenience;" that "about the 12th or 13th of February" he went to the Frisco Hospital in St. Louis; at that time "I was still suffering with my shoulder, back and head;" that at the hospital "they took an X-ray of my right shoulder and gave me medicine to make me rest, ease my pain. I was there about a week;" that he returned home but the pain continued and after about ten days he went back to the hospital but "didn't receive any treatment only what I called for, resting medicine, something to ease me, I would call for it two or three times a day when the pain in my shoulder would get to bothering me" and that thereafter he was treated by Dr. Hazel an osteopathic physician at Monett. Plaintiff further testified that as a result of the injury his right hand was "useless;" that he "has no strength in the fingers" of that hand, cannot "button my clothes" and "cannot hold a knife or fork" in that hand or "cut food;" that "I cannot put by right hand to my face;" that his arm feels "numb" all the time; that he has a "pain in his shoulder all the time" and "my back kinda hurts me between the hips, in the small of my back;" that he is nervous and "nervousness keeps me awake;" and that he had expended about $70 to date of trial for treatment and was yet indebted therefor to Dr. Hazel though the amount of such indebtedness was not shown. Dr. Hazel, testifying as a witness for plaintiff, stated that he examined and treated plaintiff and had X-ray pictures made; that in his opinion the X-ray pictures, introduced in evidence, show "a partial dislocation of the right shoulder;" that he diagnosed plaintiff's injury as "a slight dislocation . . . a subluxation of the right shoulder articulation;" that he first prescribed and used "hot packs" and then "bound the arm and shoulder in a sling." It seems the arm was "bound in a sling" three or four days. Dr. Hazel said "there was not a complete dislocation of the shoulder." This witness testified further: "Apparently there was an inflammatory condition of the bursa. The bursa is the soft tissue, the cushion around the joint;" that the right arm is "apparently useless" and "I wouldn't promise that there is anything" that can be done "to make it useful." A Dr. DeTar, a physician of Joplin, Missouri, examined plaintiff for the first time during the trial. He testified that plaintiff's arm "shows marked limitation of motion. . . . There is marked crepitation, that is scar tissue, in the joint due to subdeltoid bursitis . . . the bursa is not in normal condition now. There is apparently scar tissue there. There doesn't seem to be any fluid in the girdle or socket or it has been decreased. This man is now suffering from inflammation of the bursa under the deltoid muscle. The outside or pad muscle of the shoulder is the deltoid . . . he has limitation of motion in all directions and you get marked snapping and popping in his joint when you move it

. . . his shoulder is not dislocated now." On direct examination the following questions were asked this witness and answers given:

"Q. What have you to say as to the permanency of the conditions which you have testified to? A. This condition has existed about a year; there is a history of becoming worse. I don't see, in my opinion, why it shouldn't be permanent.

"Q. In your opinion is that arm now capable of any use? A. Well he can't use it.

"Q. And you would then say it is useless? A. It is at present so far as he is concerned."

Appellant says the trial court erred in giving plaintiff's instruction on the measure of damages as the instruction authorized the assessment of damages for permanent injury when "there was no evidence upon which to base a finding of permanent injury." The quoted excerpt from the testimony of Dr. DeTar, taken with the medical testimony on the part of plaintiff as a whole, afforded evidence tending to show that the conditions which the doctors found, and attributed to the injury, were of a permanent character. Too Dr. Hazel's testimony is susceptible of the construction that in his opinion such conditions could not be remedied. The assignment must therefore be ruled against appellant.

It is contended, however, that the verdict of $8000 in favor of plaintiff is, under the facts, excessive. Plaintiff was thirty-eight years of age at the time of the injury. He was earning $5.63 for each working shift of eight hours, Though he stated he earned on an average of $150 per month it developed upon cross-examination that he had not earned as much as $150 per month during any month of the preceding year and the amount thereof was left uncertain. The evidence as to pain in the back or a back injury is very unsatisfactory. It does not appear that plaintiff ever complained of a back injury to either Dr. West or Dr. Hazel, the two doctors who treated him nor that either doctor treated him for such an injury or found evidence thereof in their examinations of plaintiff nor do they, or Dr. DeTar, refer to a back injury in their testimony. The evidence as to the extent to which plaintiff is able to "grip" objects or use his right hand, i. e., the strength of that hand, is confined to what plaintiff says about that. His medical witnesses admittedly did not, or could not, determine that other than as such condition was stated to them by plaintiff. There is no evidence that the fingers of that hand are stiff or that the movement thereof is other than normal and natural. The most, of a positive character, that the medical testimony does show is that he is suffering from what the doctors call "subdeltoid bursitis" causing a stiffness in the shoulder joint and "a marked limitation of motion," in all directions, of the arm and shoulder, no opinion as to the degree or per cent thereof being stated, and that such condition is in the opinion of plain-

tiff's medical witnesses permanent. Plaintiff's medical witnesses do say that at the time of trial the arm was "apparently useless" and "he can't use it at present," these statements were evidently based upon what plaintiff had stated to these doctors as to his ability to use his arm and hand and not upon any reliable tests or examinations to determine that matter made by the doctors. Plaintiff said he had been unable to use his hand since the injury; his wife testified that he had not done so and a friend who said she had seen him "about every day for two or three weeks after he was injured" and had "frequently been in his house since" said "she had never seen him use his right hand for anything since he was injured." Plaintiff admitted on cross-examination: "I have driven a car since I was hurt. I drive a Ford car, Model T. I went to driving right away after I got hurt." Defendant's medical and X-ray experts examined the X-ray pictures which Dr. Hazel had caused to be made, shortly after the injury, and which plaintiff introduced in evidence. It will be remembered that it was Dr. Hazel's opinion these pictures showed "a subluxation of the right shoulder articulation." However, defendant's witnesses, having made an examination thereof, said the pictures showed no dislocation, subluxation or evidence of any shoulder or arm injury or "abnormality of any kind." Plaintiff had no hospital expense or expense for medical treatment except the charges made by Dr. Hazel; the amount thereof shown being $70. We are inclined to the conclusion that the verdict is excessive by at least $3000. [Davenport v. Electric Co., 242 Mo. 111, 145 S. W. 454; Hulse v. St. Joseph Ry. Co. (Mo.), 214 S. W. 155; Mahmet v. American Radiator Co. (Mo.), 294 S. W. 1014; Clark v. Mississippi River & B. T. Ry. Co., 324 Mo. 406, 23 S. W. (2d) 174.]

If therefore plaintiff will within ten days enter a *remittitur* of $3000 the judgment will stand affirmed for $5000 as of date of the original judgment; otherwise the judgment will stand reversed and the cause remanded for a new trial. *Sturgis* and *Hyde, CC.,* concur.

PER CURIAM:—The foregoing opinion by FERGUSON, C., is adopted as the opinion of the court. All the judges concur.