MARGARET C. ILGENFRITZ, Appellant, v. THE MISSOURI POWER & LIGHT COMPANY, a Corporation.—101 S. W. (2d) 723.

Court en Banc, February 19, 1937.

*Murrell & Murrell* for appellant.

*Hunter & Chamier* and *E. M. Jayne* for respondent.

HYDE, C.—This is an action for personal injury alleged to have been caused, September 19, 1932, by a fall upon a slick floor. At the close of plaintiff's case the court gave and read to the jury a peremptory direction to find for defendant. Thereupon plaintiff took an involuntary nonsuit with leave to move to set the same aside. Motion to set aside was duly filed, but was overruled and plaintiff appealed from the judgment of dismissal.

This case was heard in Division One, but was transferred to the court en banc because the judges of that division were equally divided on the two divisional opinions. [Sec. 4, Amendment of 1890 to Art. VI, Constitution.] The facts were, as stated in the divisional opinion of BRADLEY, C., as follows:

Plaintiff, an osteopathic physician, sixty-two years old at the time of accident, sought to recover $25,000 for her injuries. She and her husband were customers of defendant at Kirksville, and on the day of injury, she went to defendant's office to pay a light bill. She alleged that the defendant "had carelessly and negligently placed upon the floor of its said store and building a large amount of wax, oil, or other substance, and had caused and permitted the floor of said building, office and storeroom to become dangerous and unsafe for persons walking thereon; that while plaintiff was in said building and office and place of business as aforesaid, and due to the carelessness and negligence of said defendant in permitting and causing the

floor of said building and place of business to become dangerous to persons walking thereon, she slipped and fell upon the floor of said premises and sustained severe and permanent injuries; that at all of said times, said defendant knew, or by the use of reasonable care, should have known, that the floor of said building and storeroom was slippery and was dangerous and unsafe for persons to walk thereon; that as a result of said fall, and that by reason of the carelessness and negligence of the defendant as aforesaid," plaintiff received the injuries complained of. The answer was a general denial. The sole question is: Was there any substantial evidence tending to show any such negligence on the part of defendant?

Defendant's office was on the north side of the square in Kirksville. The cashier's cage was on the west side of the building and forty or fifty feet north from the front door. Plaintiff entered at the front door and walked to the cashier's window, paid her bill then started to leave, going out the same way she entered. When about eighteen feet from the cashier's window her feet suddenly slipped out from under her and she fell on her hip and back and was injured. The floor was covered with waxed and polished linoleum. We set out the substance of plaintiff's evidence without reference to direct and cross-examination. Plaintiff testified that she was just walking along and all at once her feet went out from under her; that "both of my feet just went right out quick, right from under me;" that the place where she fell was slick, "was decidedly slick. Q. What were you doing as you walked towards the door? A. I had the bill in my hand. I was just looking at my pocket book and I started to put the bill in my pocket book." Plaintiff said that the shoes (which were exhibited to the jury) she was wearing on the occasion of her injury, and not worn since, had leather soles and heels and "showed evidence of wear;" that no rubber was on the soles or heels; that the room was light; that she had on prior occasions been to this office to pay her bills; that the floor covering was the same that had been there before. "Q. Did you observe it as you went in there? A. Why, yes, I just glanced down as I went in there like anybody would. . . . It looked like a linoleum floor that had been waxed; there was some kind of dressing on it. . . . I was walking rather slowly. My walk now is slow. At that time it was just medium. I didn't go awful fast and I didn't poke around. Q. Now, Mrs. Ilgenfritz, you say that the floor appeared slick. There wasn't anything visible on the floor there at that time? A. It just looked slick. I didn't see anybody applying anything to the floor. Q. All that you know about was that you did slip there? A. Yes, sir. Q. But when you afterwards looked, there was nothing on the floor there? A. Well, it just looked slick. There was something that made me fall, made it unusually slick there or I wouldn't have fallen.

Q. When you say 'slick' you mean it was just smooth? A. Well, I would term it—it just looked slick, as you look over anything and can see where it is shiny and slick looking. I didn't observe it (the floor) closely when I went in . . . I saw the floor when I went in there. When I passed out I did not look at the floor—I never looked especially only to see that I can walk over something; just like anybody does. . . . I do not know whether the floor was level or not. . . . As far as I noticed *there was no particular difference between this particular place and the rest of the floor.* I didn't look at the rest of the floor as carefully as I did over there, because I kept wondering—I didn't notice any place else at all but that one place. I didn't notice the rest of the floor. . . . After I looked (from a chair in which she was placed after the fall) over there and saw the condition of the floor, I thought possibly that (the condition) had something to do with it and that it had caused it. . . . Q. Dr. Ilgenfritz, you stated this morning that you looked at the place where you slipped and fell and that the same was glossy and slick. What was the dimensions of the place that you spoke of? A. I would say it was about two or two and a half feet, something like that, across. Q. You mean in diameter? A. In diameter, yes, sir. Q. Now, how are you able to fix the size of the place where you slipped there? A. Well, it looked different. It looked different from what it did over in the other part. Q. Surrounding that did it appear glossy and slick? A. Not so much so as that one place there seemed to be the place that was the slicker, or slick.'' Plaintiff said that the place where she fell was ''about 18 feet from the cashier's cage, going towards the door.''

Lloyd Jones testified that until a short time prior to plaintiff's fall, he was in the employ of defendant; that he was familiar with the linoleum on this floor; that it was inlaid and of medium weight; that it was cared for by scrubbing and waxing; that the wax used was paste wax ''and was polished with an electric polisher;'' that the effect of waxing the linoleum was to ''make the floor slick and glossy; that is the purpose of it, to make it look good;'' that this floor had been recently waxed; that it was waxed once a month; that he fell once on a waxed linoleum (this same floor) ''while working there.'' On cross-examination Jones said that his duties required him to be ''in the front or showroom of the office most of the time. . . . As a salesman, I was there with the merchandise that was for sale and kept there on display. I saw the linoleum all the time. *It was treated the same way all the time.* There was an average of 1500 or 2000 people came into the office every month. I never knew of anyone falling on the floor. I believe when I fell, I had snow on the bottom of my shoes.'' Redirect: That at time plaintiff fell the refrigerators were displayed on the west side of the show or office

room. "Q. What was the condition of the floor there, I mean the floor itself, as to whether or not it was even or uneven? A. Well, I recall it was *very uneven in places* because of the fact that we had to chunk up the refrigerators at times in order to get them to set level. They are more efficient when they are level, and we leveled them up in order to operate them. Q. Where was the uneveness of floor—I mean the boards and the floor itself, where was that from the cashier's office? A. *Extending back from the front display window back within six or eight feet of the cashier's desk or cage.* Q. What was the reason of the unevenness of the floor there? A. That I can't answer very well, unless it was the weight of the refrigerators." Jones further said that the floor was more or less wavy as the result of excess weight "on that particular floor;" that the condition was not noticeable, "except as you wanted to set something that had to be level;" that there was nothing "that would cause you to stumble; it was just uneven in places;" that he "would hardly think" that a person *not familiar with it,* walking "on this wavy floor" *would be able "to discern or see it was wavy."* (Italics ours.)

Frank Neal testified that he was in defendant's storeroom about a month prior to plaintiff's fall; that he observed that the linoleum was waxed, was shiny and "slippery in places;" that he was there to look at a refrigerator and that the floor "was slippery all over where I was at;" that there were "some forty business houses around the square" and that he had never seen "a linoleum in the condition that one was" in any of these places. D. I. Stephenson was in defendant's storeroom "along about" the time of plaintiff's fall, "to make a payment" and testified that the linoleum was slippery. "In fact, when I walked across it, I kind of balanced myself to keep from slipping. I was watching my step;" that he could see that the linoleum had been waxed and polished. R. M. Pickell testified that he was in defendant's storeroom "a short time prior" to plaintiff's fall; that he noticed "the linoleum was slick;" that he entered at the front door, went to the cashier's cage, transacted his business and started to leave the building "when I slipped;" that he slipped at a place between fifteen and twenty feet from the cashier's cage, but did not fall; that his "feet shot out from under him," but that he caught himself. "Q. What was the condition of that linoleum there at that time? A. I thought it was pretty slick." Pickell further testified that he was frequently in other business houses in Kirksville, "carrying on my business, insurance and abstracting;" that he did not think of "any other floor at that time upon which there was a linoleum that was glossy and slick like the one in defendant's place of business."

L. L. Reese testified that prior to December 31, 1931, he was in the employ of defendant and "was familiar with the manner in which

they took care of the linoleum in their office;'' that ''they used a liquid Johnson's wax and polished it with an electric floor polisher. I was familiar with the condition of the floor in front of the cashier's window on the west side. The floor was not level, I would say, two and a half feet from the cashier's window to within about four feet of the front window on the west side of the floor. Well, along the mopboard, you all know what that is, the floor was wavy. It was caused from the weight of the refrigerators. We usually kept displays along that side. The floor was in a wavy condition along the west wall of the entire showroom, with the exception of two feet at the cage and about two and a half or three feet from the front window.''

Byrd Reed testified that he was in defendant's storeroom on or about September 19, 1932 (date of plaintiff's fall), and observed the condition of the linoleum (on cross-examination he was uncertain as to date); that it was ''what you would call a slick floor;'' that he observed that *''it was slick all over the building,* all over the office was slick. It was slick enough that I always watched my step very carefully when I went in there because I didn't want to fall;'' that it was a polished floor; that the floor ''was brought to this high polish'' in 1932; that the polish was taken off ''a month or two after September,'' 1932; that the floor was ''a beautiful thing to look at;'' that nobody in Kirksville that ''I know anything about that did their floors that way. That is the only one in Kirksville that I have witnessed do that in a place of business.'' Defendant filed an additional abstract, but we do not deem it necessary to enter upon a consideration of this. The evidence is fairly set out in the abstract filed by plaintiff, appellant here.

 It is first contended by defendant that the evidence concerning the wavy and uneven condition of·the floor cannot be considered, because not pleaded. The allegations that defendant ''caused and permitted the floor . . . to become dangerous and unsafe'' were broad and general, and no objection was made to this general statement or to the introduction of this evidence. In this situation the petition may be considered as amended to include the wavy and uneven condition. [Rock v. Keller, 312 Mo. 458, 278 S. W. 759; Garbee v. St. Louis-S. F. Ry. Co., 220 Mo. App. 1245, 290 S. W. 655; Blake v. White (Mo. App.), 300 S. W. 313; Whitehead v. Koberman (Mo. App.), 299 S. W. 121; Koonse v. Standard Steel Works Co., 221 Mo. App. 1231, 300 S. W. 531; Longworth v. Farmers' & Traders' Bank (Mo. App.), 300 S. W. 546; Treece State Bank v. Wade (Mo. App.), 283 S. W. 714; Ehrlich v. Mittelberg, 299 Mo. 284, 252 S. W. 671; Gilliland v. Bondurant (Mo. App.), 51 S. W. (2d) 559.]

 An owner or occupant of lands or buildings who directly or by implication invites others to go thereon, of course, owes such per-

sons the duty to exercise ordinary care to have the premises in a reasonably safe condition. And if there are hidden dangers upon the premises such owner or occupant must use ordinary care to warn thereof. [20 R. C. L., sec. 51, p. 55; Cluett v. Union Electric Light & Power Co. (Mo.), 220 S. W. 865, and cases there cited.] "The law is well settled that an owner or occupant of land who by invitation, express or implied, induces or leads others to go upon premises for any lawful purpose is liable for injuries occasioned by the unsafe condition of the land or its approaches, if such condition was known to him and not to them." [20 R. C. L., sec. 51, p. 56; McKeighan v. Kline's, Inc., 339 Mo. 523, 98 S. W. (2d) 555.] This rule has been invoked in many situations, but most frequently where injuries have resulted from unguarded excavations, unprotected stairways, hatchways, trapdoors, turnstyles, revolving or swinging doors and collapsing buildings. [20 R. C. L., p. 56.] "The liability of a possessor of land who maintains a condition or conducts an activity thereon, for bodily harm caused thereby, is governed by the rules which determine liability for negligence, the public interest in his free use of his land being an important factor in determining the reasonable or unreasonable character of the risk which the condition or activity involves." [Restatement of the Law of Torts, p. 984.] And further: "In determining the extent of preparation which a business visitor is entitled to expect to be made for his protection, the nature of the land and the purposes for which it is used are of great importance. One who enters a private residence even for purposes connected with the owner's business, is entitled to expect only such preparation as a reasonably prudent householder makes for the reception of such visitors. On the other hand, one entering a store, theatre, office building or hotel, is entitled to expect that his host will make far greater preparations to secure the safety of his patrons than a householder will make for his social or even his business visitors. . . . [Comment (e) under sec. 343, p. 943, Restatement of the Law of Torts.]

The charge of negligence herein amounts to this: Defendant's floor was not reasonably safe because it was waxed. Under the evidence, amendment of the petition could only make out a charge that it was negligence to wax a floor that was not so level that any piece of furniture with four legs (like a refrigerator) would be absolutely level on it. There is nothing to show, and we hold that it is not a reasonable inference from anything shown, that because the floor was not absolutely level, it was any slicker or more difficult to walk on than if it had been level. Floors are not usually perfectly level and if one is so nearly level that no one would see a slope it cannot reasonably be said that there is any defective condition so as to make it unsafe for that reason. (So far as shown the only thing that made the floor vary anywhere from an absolute level was the weight of

refrigerators along the wall.) If it was so nearly level that the condition was not noticeable to the eye, but could be discerned only when "you wanted to set something that had to be level," then it is not reasonable that such a slight incline could have had any substantial effect on its safety. To allow a jury to say that such a slight variation from an absolute level would make any difference in the safety of the floor would permit a verdict to be based upon mere speculation and conjecture and not on reasonable inference from any fact.

If this floor was too slick to be reasonably safe, it was because the wax made it too slick and not because of any such slight incline. It is not contended or shown that the floor was any slicker, or that any more wax was put on it at this time, than ever before. It is said that plaintiff did not have full knowledge of conditions because she did not know of any incline. Would she have walked any differently if she had? Would any one think that an incline so slight that they could not see it required a different way of walking? Suppose defendant had put up a sign saying: "Caution, this floor is not level, a refrigerator will not set level on it." Would anyone reading this walk any differently when, after looking, they could see no noticeable incline? Surely one could safely walk, on such a slightly inclined polished floor, exactly like one would on an absolutely level polished floor. How could there be any reasonable difference of opinion about that matter? Nor can the fact that it had been recently waxed (there was nothing to show how recently) make any difference. If it was not proper, in the exercise of due care, to allow people to walk on the floor until the wax had worn off, then it was negligent to put wax on it at all. Therefore, the question is still only whether or not it is negligence to have a waxed floor, not absolutely level under test, in such a place of business, where many customers must walk; or, in other words, is the mere fact that one person fell on a floor (in such an establishment where thousands went safely) sufficient to make a jury case of a dangerous and unsafe condition, when there was not sufficient slope in it so that anyone could determine by looking at it whether it was level or not? Surely something more must be shown. Negligence is not proved by such an isolated occurrence. It must be predicated on what should have been anticipated, and not merely on what happened. [McCollum v. Winnwood Amusement Co., 332 Mo. 779, 59 S. W. (2d) 693.] In Nephler v. Woodward, 200 Mo. 179, 98 S. W. 488, this test was applied in a case in which it was alleged that plaintiff was caused to fall by catching her foot in a small hole in a carpet in the aisle of a theatre. There, of course, a hole in the carpet was not a proper condition and in addition the aisle was dimly lighted.

It is clear that the waxed condition of this floor was obvious.

Therefore, authorities cited about duty to warn invitees are not decisive here. This case seems to be clearly within the rule of Paubel v. Hitz, 339 Mo. 274, 96 S. W. (2d) 369, because, under this evidence, the slight slope of the floor was not shown to be a hidden danger or any danger at all. All of the evidence in this case was plaintiff's evidence and, considered as a whole, it shows that anyone entering could see that this was a waxed floor, in good condition, and without obstruction. Plaintiff had been in this place many times. It was light so that she could see and she did see that "it looked like a linoleum floor that had been waxed;" that "there was some kind of dressing on it;" that "it looked slick;" and that it was "shiny and slick looking." This is not a case where plaintiff had reason to expect a condition of one kind and without warning was met by another. There is no substantial evidence that the part of the floor where she fell was any slicker than any other part. On the contrary, all the evidence was that the whole floor was waxed and polished, and that it was kept in this condition by applying liquid floor wax every month and polishing it with an electric polisher. This was no doubt done partly to give it a pleasing appearance and partly to prevent wear of the linoleum. It was shown that from 1500 to 2000 persons walked over this floor every month and that the only person who had ever previously fallen on it had snow on his shoes. This certainly shows a condition, which would not be reasonably anticipated to be the cause of injury to customers in the usual exercise of ordinary care for their own safety.

The only reasonable conclusion seems to be that plaintiff fell because, while putting the bill in her pocketbook, she was paying no attention to how or where she was walking. Everyone is familiar with floor wax and its effect on floors. Everyone knows that a waxed floor must be walked over somewhat differently from a rough floor, and she was required to exercise the reasonable care that anyone could see was required by the circumstances for her own safety. However, whether she was careful or not, or whether her conduct was contributory negligence or not makes no real difference, because there is no evidence to show that defendant was guilty of any negligence, and, even if plaintiff was careful, defendant is only liable if it was negligent. It was not negligent unless there was something on the floor that in the exercise of due care should not have been there. This evidence does not show that there was. To hold defendant liable here would make it liable as an insurer and not because of negligence. Missouri cases of liability for slick substances on a floor which are cited for plaintiff or which we find, as a consideration of a few typical ones will show, are cases where the condition of a certain part of the floor was different from the rest and this difference was not likely to be noticed by persons walking thereon, or where it was not

proper to leave the substance there at all. Smith v. Sears Roebuck & Co. (Mo. App.), 84 S. W. (2d) 414, and Scott v. Kline's, Inc., 284 S. W. 831, are both cases of allowing a considerable accumulation of water to remain on certain parts of a floor, making the floor slicker there than elsewhere. In Moore v. Great Atlantic & Pacific Tea Co. (Mo. App.), 92 S. W. (2d) 912, much of the floor was wet and slippery from recent mopping with a cleaning solution. It was held that it was negligent to do this at a time when the store was open to the public. In Murphy v. Fidelity National Bank & Trust Co., 226 Mo. App. 1181, 49 S. W. (2d) 668, there was a loose mat on the floor over a place that was "wet and soapy or smeary." This made the mat slip when plaintiff stepped on it. In Petera v. Railway Exchange Bldg. (Mo. App.), 42 S. W. (2d) 947, soap was allowed to remain on a part of the floor of a corridor. In Cluett v. Union Electric Light & Power Co. (Mo.), 220 S. W. 865, this court held that plaintiff did not make a case of negligence of leaving the floor wet and slippery because she said that she fell at a place where the floor was dry. [See, also, Peck v. Yale Amusement Co. (Mo.), 195 S. W. 1033.]

There does not seem to be any substantial distinction between this case and Mullen v. Sensenbrenner Merc. Co. (Mo.), 260 S. W. 982. In that case, there was a small crack in a tile entrance with an incline of about one inch to the foot. Plaintiff claimed she fell at the place in this entrance, where this crack was located, and also claimed that the tile was slick. This court said: "She saw that it was of tile, and saw the kind of tile it was, and could see and feel how smooth or slick it was. She saw that it was without rugs or covering, and noticed its slope. . . . Defendant knew of no condition or danger (if any), connected with said entrance not known or visible to plaintiff." The crack was "hardly perceptible and apparently no larger, if as large, as the space between the tile in other places where there is no crack." The court said that the crack in this floor "in which plaintiff says she caught the heel of her shoe and which caused her to fall was so small as to be negligible;" and that "to hold the owner liable for negligence in permitting such cracks to be in a floor would be to hold him liable as an insurer." We hold the same is true of whatever sloping, uneven, or wavy condition there was in this case. We recognize that it might be negligence to put floor wax in certain places where people would step on it unexpectedly, as, for example, where they would step off of an elevator or a moving stairway or in a dimly lighted room or corridor; or it might be negligence to put wax on a substantial incline. We hold that it is not negligence to merely wax an office floor when it is obvious to all who use it that it is waxed; when no unusual amount or kind of wax is used so as to make it slicker than waxed floors of like character are usually

kept; when the floor is so nearly level that no one could determine that it was not level without making some kind of a test; and when persons using it are only required to walk over it in an ordinary careful way in order to keep from falling.

The judgment of dismissal is affirmed.

PER CURIAM:—The foregoing opinion by HYDE, C., in Division One, is adopted as the opinion of the Court en Banc. **All concur.**