Jake BOWYER, Respondent,

v.

TE–CO., Inc., a Corporation, Appellant.

No. 46132.

Supreme Court of Missouri,
Division No. 1.

March 10, 1958.

Chapman & Chapman, Wilton D. Chapman, Thomas W. Chapman, and Adolph K. Schwartz, St. Louis, for appellant.

James W. Jeans, Hullverson, Richardson, Hullverson & Jeans, St. Louis, for (plaintiff) respondent.

HOLLINGSWORTH, Presiding Judge.

Defendant has appealed from a judgment awarding plaintiff the sum of $20,000 for personal injuries sustained when plaintiff's foot slipped and caused him to fall as he stepped upon an allegedly defective stone slab in the paving at the rear entrance of defendant's place of business in the City of St. Louis. Defendant complains of the refusal of the trial court to direct a verdict in its behalf, of error in the admission of evidence, error in the giving and refusal of certain instructions, excessiveness of the verdict, and refusal to permit defendant to amend its answer. .

In determining whether there was substantial evidence of defendant's negligence and the alleged excessiveness of the verdict, we consider the evidence most favorable to plaintiff and all inferences that reasonably flow therefrom and disregard defendant's evidence unless it aids plaintiff. So reviewed and considered, the jury reasonably could have found the facts as herein stated.

On the afternoon of August 10, 1954, plaintiff, a grain and dairy farmer, aged 54 years, residing at Keenes, Illinois, rode to St. Louis, Missouri, with Mr. and Mrs. Aaron Compton in the Compton's automobile for the purpose of attending a meeting of Production Credit Corporation, of which plaintiff and Mr. Compton were directors. Plaintiff brought with him for the purpose of having it repaired a machine belt which he had priorly purchased from defendant. Defendant's place of business, a four-story building, is located at 801 North Second Street. The building fronts east and is situate on the northwest corner of North Second and Delmar Avenue. The Comptons stopped their car, headed south, in front of defendant's building, shortly prior to 4 p.m. The day was hot and clear and the pavements were dry. The Comptons remained in their car as plaintiff went into the front office and advised the receptionist of his wish to have the belt repaired. She told him to "take it back to the rear of the building", "to go around in back", "to go to the back door and locate someone to take care of that condition." Plaintiff never before had seen the rear of defendant's premises. He came out the front entrance, walked south to Delmar, thence west on Delmar upon the brick sidewalk to the rear of the building, which faced an alley. When he reached the alley, he turned to his right and looked for the rear entrance door. That door is situate up a flight of four steps. They are made into a concrete loading dock extending along the rear end of the building and over which one must cross to reach the door. Forming a part of the paved way connecting the brick sidewalk with the steps leading to the rear door is a stone slab 1½ feet in

width and 5 feet in length. As plaintiff faced north, looked for and discovered the door, he saw and stepped upon the stone slab. Plaintiff testified that "when I put the ball of my foot on this stone my foot slipped off to the side—south—caused me to be pitched to my right and I fell." After falling, plaintiff saw that the stone "was slippery or smooth and rounded." That stone, as shown by other evidence in the case, had been in its present location for more than 26 years, is worn smooth and round at its south edge with use and by weather, and "slopes to the south."

Defendant's Exhibit "B" (the camera pointed eastward along Delmar) shows the rear of defendant's building, the (white) stone slab upon which plaintiff's foot slipped and the relationship of the slab to the sidewalk and the rear entrance.

Plaintiff felt pain when he fell and heard a snap as though a stick were broken. His foot, as he saw after he had fallen, was dislocated to the extent that it pointed outward at a right angle. Plaintiff was taken to the City Hospital. It was there discovered his right ankle was broken. The break was set, and his

Defendant's Exhibit "B"

leg, ankle and foot were placed in a cast. Plaintiff was furnished crutches and, by the Comptons, taken to the meeting of the Production Credit Corporation at the Chase Hotel, which lasted throughout the 11th and 12th of August. Due to pain, he attended but one session, leaving it after a short stay. On the morning of the 11th, he consulted Dr. L. T. Ford at Barnes Hospital. Such further details of plaintiff's injuries as may be necessary to disposition of the case will be hereinafter stated.

On the afternoon of August 12, plaintiff and the Comptons, preparatory to returning to Illinois, went to defendant's offices to get the belt that had been left for repairs. There they talked with Mr. Albert Panhorst, defendant's vice-president. Over objection of defendant, plaintiff and the Comptons testified that Mr. Panhorst advised them that defendant knew the slab was in bad condition but had been putting off repairing it.

On cross-examination plaintiff testified that he was watching where he was going and also watching to find the door and the steps to go up to it; that as he "came up there" nothing obstructed his vision of the stone; that he was looking as anyone else would look in the general direction of where he was going and he did not "pinpoint" the slab and stop to look at it.

■ Before consideration of the defendant's contention that there was no showing of its negligence, we should determine its contention that the court erred in admitting into evidence the testimony that defendant's vice-president had told plaintiff that the stone slab was in bad condition and defendant had been putting off repairing it. Defendant cites Redmon v. Metropolitan St. Ry. Co., 185 Mo. 1, 84 S.W. 26, and Kenney v. J. A. Folger & Co., Mo.App., 192 S.W.2d 73. In the Redmon case, the plaintiff was permitted to testify that immediately after being injured by the sudden stopping of defendant's streetcar, defendant's conductor told

him that the cause of the sudden stopping was that a coupling pin had fallen from the car into the slot rail. In the Kenney case, the plaintiff had been struck by defendant's truck. Her witness was permitted to testify, in an analogous situation, that defendant's truck driver said, "No, it was my fault." Neither of these cases is in point.

We think the evidence was admissible for two reasons: (1) To show an admission by an executive officer of defendant of its prior knowledge of the condition of the stone slab for sufficient length of time to have remedied the condition. See Yarbrough v. Wisconsin Lbr. Co., Mo.App., 211 S.W. 713, 714 [5-7]; State ex rel. S. S. Kresge Co. v. Shain, 340 Mo. 145, 101 S.W. 2d 14, 17. (2) To show defendant's dominion over the stone, the importance of which fact will hereinafter become apparent. Moreover, defendant, in any event, definitely waived any right to assert error in the admission of said statement by introducing and reading into evidence as admissions of plaintiff portions of his deposition, including:

"A. He (Panhorst) was discussing with me the condition that the walk was in.

"Q. I see. And what did he tell you? A. He told me that it had been in bad condition for quite a while and that they had been intending to fix it but they had been putting it off just like we do things around the home."

■■ Defendant does not in this court contend that plaintiff was guilty of contributory negligence as a matter of law. In support of its contention that the evidence does not make a submissible case of its failure to exercise ordinary care, defendant cites Main v. Lehman, 294 Mo. 579, 243 S.W. 91; Cash v. Sonken-Galamba Co., 322 Mo. 349, 17 S.W.2d 927; Ilgenfritz v. Missouri Power & Light Co., 340 Mo. 648, 101 S.W.2d 723; Stoll v.

First National Bank of Independence, 345 Mo. 582, 134 S.W.2d 97; Hudson v. Kansas City Baseball Club, 349 Mo. 1215, 164 S.W.2d 318, 142 A.L.R. 858. The theory of disposition of the Main case, supra, is set forth in this statement of the court, 243 S.W. loc. cit. 93: "The mere fact that there was a step in the toilet six inches high, which plaintiff would have to ascend and descend, was not in itself evidence of a want of due care on defendant's part, because such steps are usual in dwellings and store buildings." The Cash case, supra, was ruled upon a finding of plaintiff's contributory negligence as a matter of law rather than upon the question of defendant's non-negligence. Neither of those cases is helpful to defendant upon the issue of its negligence.

In the Ilgenfritz case, supra, it was said, 101 S.W.2d loc. cit. 728, that it was not negligence "to merely wax an office floor when it is obvious to all who use it that it is waxed; when no unusual amount or kind of wax is used so as to make it slicker than waxed floors of like character * * *." In the Stoll case, the court said of plaintiff's case, 134 S.W.2d loc. cit. 102: "She saw and observed that condition of the floor and steps and had observed that condition previously. There was no foreign substance on the floor and she met no unexpected condition. The evidence fails to show any negligence of appellant or the breach of any legal duty owed by appellant to respondent." Neither of those cases is in point in the instant case.

The proprietor of a business place is charged with the duty to exercise ordinary care to keep his premises in a reasonably safe condition for the use of his invitees. "The basis of the defendant-proprietor's liability is defendant's superior knowledge of an unreasonable risk of harm of which the invitee does not or in the exercise of ordinary care should not know. Such a defendant is not liable for injuries due to dangers which are obvious, or as well known to plaintiff as to defendant. And in such circumstances there is no duty to warn because the invitee has the information which would be conveyed by a warning." Stafford v. Fred Wolferman, Inc., Mo., 307 S.W.2d 468, 473 [1–3], and cases therein cited.

In the instant case, plaintiff, an invitee of defendant, was sent to the rear of defendant's premises, with which he was a total stranger, to search out in an alleyway and to enter a door, which, as he turned into the alleyway, he discovered to be above the street level upon which he had been walking, and which necessitated his ascending four concrete steps. The obvious access to these steps required him to step upon and walk across the stone slab shown in the above picture. We are convinced that a jury reasonably could find that its appearance to a person in the exercise of ordinary care for his own safety, under the circumstances here shown, was not such as to charge him with knowledge that its condition made it dangerous to step upon; and certainly not to charge him with the same degree of knowledge as that of defendant, who had known it for 26 years and (according to plaintiff's evidence) knew it was in bad condition but had delayed repairing it. Wattels v. Marre, Mo., 303 S.W.2d 9, 14 [5, 6].

Defendant also insists there was no competent evidence that the stone slab was owned by or was upon defendant's premises. There seems to have been no dispute at the trial that it was attached to and used by defendant as a part of its premises. Throughout the trial, both parties and the witnesses so assumed and, insofar as we have found, that assumption was never challenged. The above picture shows that the slab is attached to and constitutes a necessary adjunct of user of the stairway leading to the rear door by one entering from the sidewalk. The statement of Mr. Panhorst, defendant's vice-president, that defendant knew the slab was in bad condition and had put off repairing it is substantial evidence of its being under defendant's control and by it used as a part of its prem-

ises.  Hemphill v. City of Morehouse, 162 Mo.App. 566, 142 S.W. 817, 820 [6].

The contention that there was no evidence of negligence on the part of defendant must be overruled.

■ Defendant next contends that Instruction No. 1, the verdict-directing instruction given in behalf of plaintiff, was erroneous in that it omitted a finding that plaintiff was exercising due care for his own safety.  In so contending, defendant overlooks the fact that Instruction No. 2, given in its behalf, directed the jury "that if the plaintiff in the exercise of ordinary care on his own part for his own safety would not have stepped on the slab or stone, * * * and that by so doing plaintiff was negligent * * * and that such negligence of plaintiff directly contributed to cause plaintiff's fall * * *, then your verdict * * * should be in favor of defendant and against the plaintiff."  The rule in Missouri is that a verdict-directing instruction given in behalf of plaintiff which omits therefrom a finding upon a pleaded issue of plaintiff's contributory negligence, supported by substantial evidence, is prejudicially erroneous unless such error is cured by the defendant's submitting that issue in its own behalf.  Defendant's instruction cured the error.  Sanders v. Illinois Central R. Co., 364 Mo. 1010, 270 S.W.2d 731, 735; Dennison v. Whaley, Mo.App., 285 S.W.2d 73, 76, and cases therein cited.

■ Defendant next contends that the court erred in refusing its instruction which directed the jury that in the event of its finding in favor of plaintiff, it "should include nothing therein for federal or city taxation thereon as no tax can be assessed or collected on the amount of your verdict." In Dempsey v. Thompson, 363 Mo. 339, 251 S.W.2d 42, 44–45, we said, in effect, that present economic conditions then were such that everyone was acutely aware of the impact of *income taxes,* and that, to avoid any misconception on the part of the jury that such an award would be so taxed, we deemed it advisable that the jury be so

instructed.  To prevent attrition of the carefully stated limitations of that ruling, a form of instruction was suggested that explicitly complied with its limitations. Defendant's proffered instruction went far beyond the holding in that opinion.  We are not convinced that the court abused its discretion in refusing an instruction broader in its terms than that suggested in the Dempsey case.

Defendant's next contention is that the trial court erred in refusing to permit it to file an amended answer alleging that plaintiff assumed the risk of whatever danger attended the use of the walk in getting to the rear door of defendant's premises.  The record shows that shortly prior to trial defendant was denied leave by the Assignment Division to file such an answer "because it was untimely."  Thereafter, when the case was called for trial, defendant asked leave of the trial judge to file it. The court refused the request, stating that "within the hour the presiding judge has refused to accept it * * *", and, "If at the end of the evidence there is some indication that * * * the court should have allowed this amendment, I will take that into consideration later."  Insofar as we have discovered, the matter was not thereafter mentioned.  No suggestion is here made that there was any evidence offered or available that warranted the submission of such a defense.  The contention is without merit.

This brings us to defendant's last assignment, to wit: the alleged excessiveness of the verdict.  The ground of the assignment is that "the verdict * * * is excessive because it included damages for an injury not sustained in this fall."

On the morning following the fall, Dr. Ford, an orthopedic surgeon, took additional X-ray pictures of plaintiff's ankle.  These showed a fracture of the fibula of the right leg, the small bone on the outer side of the leg.  The fracture had been accompanied by a dislocation of the ankle bone, shifting outward.  It had been put in place and a

cast applied under local anesthesia the day before Dr. Ford saw plaintiff. The fracture was in proper position. Dr. Ford furnished plaintiff with crutches and directed him to return in about three weeks. On August 31, 1954, the first cast was removed and replaced by another upon which a rubber heel was placed so that plaintiff could begin to bear weight upon it. X-rays taken on December 20, 1954, showed the fracture in proper position, but there was no callus or healing bone uniting the fragments. Plaintiff was advised to enter the hospital for an operation, which was performed in January, 1955. An incision on the lower leg revealed no bony union. The ends of the bone were "freshened", a pin 8 or 9 inches long was inserted and a bone graft was effected to facilitate healing. On April 7, 1955 X-rays showed progress, the cast was removed, an elastic bandage was substituted and plaintiff advised to bear weight on the leg and ankle.

Plaintiff thereafter discarded his crutches and in June, 1955, attempted to resume his duties without use of a cane but his right ankle was still stiff and painful and had been very weak ever since it was broken at defendant's premises. On July 6, 1955, he attempted to step from the ground to a porch extending in front of his granary. That porch was seven inches above the ground. As he placed his weight upon his right ankle to lift his left foot to the porch his right ankle would not hold him and he fell. That fall broke his left ankle.

On July 22, 1955, plaintiff came to Dr. Ford's office. Dr. Ford found he had a cast on his left leg. Plaintiff gave a history of a fall about two weeks before and that a local physician had placed the left leg in a cast. X-rays taken by Dr. Ford showed a recent break of the fibula—the small bone—on that ankle, and slight displacement.

"Q. Being familiar with this man's condition, of course, and assuming, if you will, as he did, he underwent an operation on the 10th and had this series of x-rays taken afterwards, and his recovery was as you stated it with swelling still there; assume on July 6, 1955, at a time when he claims his ankle was still tender, and that he stepped up about 7 inches onto a smooth threshold and as he started to put his full weight on that right ankle he collapsed and fell and broke his left ankle. Do you have an opinion, based upon reasonable medical certainty, as to the cause of that fall at that time?

\* \* \* \* \* \*

"A. It is my opinion he still had some pain, stiffness and swelling in the ankle and had pain on the use of it and that this factor played a part in the second fall that he described."

Dr. Ford removed the cast found on plaintiff's left leg, applied a "walker", so plaintiff could use crutches and bear weight upon the cast. On that date, the fracture of the right ankle was found to be more firmly consolidated than before and plaintiff was directed to continue bearing weight upon it.

Dr. Ford also found that plaintiff had a weakness of the flexor muscles in his left hand and the muscles in his left hip. Dr. Ford thereupon referred plaintiff to Dr. Lam, a neurologist, for that condition. On September 6, 1955, Dr. Ford removed the cast from the left leg, advised plaintiff to bear weight and to use a high shoe. On October 7, 1955, the fracture was healing slowly, and an elastic bandage was substituted. On December 22, 1955, Dr. Ford advised plaintiff to resume his activities.

Consulting his records of May 4, 1956, Dr. Ford further testified: "He was having more trouble on the left side. He stated if the left ankle were as good as the right he would be satisfied. He said his left side would cramp in the morning, he was having more swelling on the left than the right. He was not wearing an elastic support; he wasn't wearing high shoes and he found the condition interfered with his activities. He says he has trouble controlling the left foot

and occasionally drags the left leg on the floor. He has some difficulty with his left hand—

"Q. (By counsel for plaintiff) Is this dragging of the left foot related to this neurological condition?

"Mr. Chapman (Counsel for defendant): I object to the form of the question.

"Q. I'm trying—tell us, Doctor, whether or not this difficulty with the left hand or the dragging of the left foot was an orthopedic problem? A. It wasn't an orthopedic problem. It was a neurological problem and wasn't in my opinion the result of the fall."

Confining himself to plaintiff's orthopedic condition, as directed by his counsel, Dr. Ford further testified that on October 26, 1956, plaintiff's condition was as follows: " 'Examination of the right ankle shows a healed incisional scar over the distal fibula about five inches in length. There is slight tenderness over the ankle. There is some bony thickening over the tarsus'—the big part of the foot close to the ankle—'The ankle is slightly tender. There is slight restriction of ankle motion and inversion and eversion.' The ankle joint moves up and down. * * * There was slight loss of ability to bring the right ankle all the way and push it down all the way—slight eversion which is turning out and inversion which is turning in. Examination of the left ankle showed full range of motion upwards and downwards and a full range of the foot outward and upwards. The patient was unable to full dorsiflex—bring the foot up to ninety degrees—in that position (indicating) but I could push it up. The ankle joint itself would move up. There was some soft tissue thickening over the joint and some tenderness."

Plaintiff testified that he suffered severe pain from the first fracture. For the first two weeks following that fracture he was unable to "get around". When he first arises in the morning, plaintiff feels pretty well, but when he goes about his work, the pain in his ankles grows progressively worse until night, when they are swollen and very painful. Prior to his injuries, his son-in-law assisted with the work, aided by some part-time help. Since the autumn of 1954, however, plaintiff has had a full-time employee, paying him $200 per month. The son-in-law has assumed more duties formerly performed by plaintiff, for which plaintiff pays him regularly $50 per month. Plaintiff cannot walk over the farm or work around the dairy, or "go anywhere in the buildings and silos or take the lead in the work", all of which he formerly did. The pain in his ankles prevents him from engaging in any social activities. His medical expense to date is $450. In 1930, plaintiff jumped from a load of hay and hurt his right foot. It did not cause him trouble or pain very long. He has had no trouble from that injury in the last 25 years.

The evidence above set forth reveals that plaintiff has suffered from (1) a fracture of his right ankle, (2) a fracture of his left ankle, (3) a neurological weakness of his left hand and left side, and (4) an old foot injury. (There was also some testimony as to a developing arthritis but the testimony further showed that to be an incident of age and no contention is here made that it was a factor in the jury's verdict.)

The evidence makes quite clear that, in any event, the fractures sustained at defendant's premises and at plaintiff's granary are the only injuries or infirmities for which defendant could be held liable. No contention to the contrary is made by either party. However, plaintiff insists and defendant denies that defendant can be held liable for the injuries sustained by plaintiff by the fall at his granary.

■ Defendant says that "while the instructions did not specifically direct the jury to reward respondent for the fracture of the left ankle, and did not specifically direct them to award him anything for his neurological difficulties, yet they were couched in such language that the jury

must have considered these subsequent injuries, otherwise they could not conceivably have reached a verdict of $20,000, which is grossly excessive for the injury to the right ankle alone. It is elementary, and the decisions in this State so hold, that one may not recover for a second injury to another part of the body caused by a separate intervening event."

Two things, we think, stand out clearly from this record:

(1) There is no basis for defendant's contention that the jury either misunderstood the evidence or, in defiance of it, took into consideration any of plaintiff's injuries or physical infirmities other than the fracture sustained to his right ankle when he fell at defendant's premises, the fracture of his left ankle when he fell at his granary, and the pain disability and medical expense incident to those injuries; and,

(2) The jury did take into consideration the second fracture and the pain, disability and the medical expense incident thereto.

It is also clear, therefore, that if the evidence did not warrant consideration of the second fracture as an element of plaintiff's damages, the cause must be reversed and remanded. If, however, the jury was warranted in considering the second fracture, then we must determine whether the verdict is excessive; and, if it is, the extent of its excessiveness.

In support of its contention that plaintiff is not entitled to recover for the second fracture and its attendant effects, defendant has cited two cases: Powers v. Kansas City, 224 Mo.App. 70, 18 S.W.2d 545, 551, and Croak v. Croak, Mo.App., 33 S.W.2d 998, 1002. Both were expressly disapproved in our recent case of Creech v. Riss & Company, Mo., 285 S.W.2d 554, 561. In the latter case, it was held, in accord with the general rule, that a tort-feasor is liable to an injured person in compensatory damages for all natural or proximate consequences of his wrongful act or omission.

Was there substantial evidence from which the jury reasonably could find that the second fracture was the natural and probable consequence of the negligence of defendant which produced the first fracture? The medical testimony of both parties was to the effect that one of the approved methods employed to restore strength and mobility to a fractured ankle is to direct the patient to walk upon it. While plaintiff was so using his right ankle, and prior to its total recovery, it gave way, causing him to fall and to fracture his left ankle. It was Dr. Ford's opinion that the pain, stiffness and swelling in the ankle and pain on use of it constituted a factor in the second fall. This opinion was admitted without objection and its accuracy was not challenged at the trial and is not here challenged. Under such circumstancs, we believe the evidence sufficient to support a finding that the second fracture was a natural and proximate consequence of the same negligent act which caused plaintiff's first fall and fracture.

The final question is whether the sum of $20,000 is an excessive award for the two fractures and the disability, pain and expense directly caused thereby. Neither of the parties has given us any aid in solving that problem.

There is no precise formula for determining the question. The facts in each case must always be the paramount factor. Consideration is given the nature and extent of the injuries and losses, diminished earning capacity, economic factors and the compensation awarded and approved in cases of similar or fairly comparable injuries.

Plaintiff suffered painful and, to an extent, disabling fractures of both ankles. The first fracture would not mend and an operation was required to correct that condition. At trial time in October, 1956, the right ankle was slightly tender with some restriction of motion. The left ankle had full range of motion upwards and downwards and full range of the foot outward

and upwards. Plaintiff was unable to bring the foot up to ninety degrees (in a position indicated by the doctor to the jury), but the doctor could push it up, and the ankle joint would move up. Some tenderness was present. There was no tangible evidence upon which any loss of earning capacity can be computed.

In the case of Schonlau v. Terminal Railroad, 357 Mo. 1108, 212 S.W.2d 420, 425, this court had occasion to consider an award of $18,000 for injuries that appear to be more disabling than those in the instant case. We there said: "The final issue is whether the verdict is excessive. At the time he was injured plaintiff was fifty years old and earning $38 per week. As a result of his fall two bones in his right wrist and one bone in his left wrist were broken. The fracture of the left wrist has not united, but the fractures of the right wrist have united leaving some deformity and angulation. There was evidence that the right hand, wrist and forearm suffered disability of from 25% to 75%, as to the left up to 40%. Also there will be permanent limitation in both wrists, and that plaintiff cannot completely close his right hand. Even in view of the present economic conditions and the diminished purchasing power of the dollar we believe the verdict is excessive by at least $6,000."

A consideration of the evidence in the instant case, which we have set forth in tedious detail, convinces us that the verdict is excessive by at least $8,000.

If, therefore, plaintiff will within 15 days from the date of the filing of this opinion, file in this court a remittitur of $8,000, the judgment will stand affirmed as of the date of its rendition for the sum of $12,000. Otherwise, the judgment is reversed and the cause remanded.

HYDE and WESTHUES, JJ., concur.

DALTON, J., concurs in part and dissents in part in separate opinion filed.

DALTON, Judge (concurring in part and dissenting in part).

I concur, except as to that part of the opinion holding that the verdict is excessive and requiring a remittitur. I dissent as to this part of the opinion, because I do not believe the issue of mere excessiveness is before us and the issue is not briefed by the parties. The assignment is that "the verdict of the jury is excessive because it included damages for an injury not sustained in his fall." No relief by remittitur is requested. Appellant contends "the verdict is so grossly excessive that it cannot be cured by remittitur, and it should, therefore, be reversed."

I would affirm the judgment.